# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-30397

United States Court of Appeals
Fifth Circuit

**FILED**

September 26, 2018

Lyle W. Cayce
Clerk

JUNE MEDICAL SERVICES L.L.C.,
on behalf of its patients, physicians, and staff,
doing business as Hope Medical Group for Women;
JOHN DOE 1; JOHN DOE 2,

                              Plaintiffs-Appellees,

versus

DOCTOR REBEKAH GEE, in her official capacity
as Secretary of the Louisiana Department of Health and Hospitals,

                              Defendant-Appellant.

Appeal from the United States District Court
for the Middle District of Louisiana

Before HIGGINBOTHAM, SMITH, and CLEMENT, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

Louisiana enacted the Unsafe Abortion Protection Act ("Act 620" or "the Act"), requiring abortion providers to have admitting privileges at a hospital

No. 17-30397

located within thirty miles of the clinic where they perform abortions.[1]  On remand for consideration in light of *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) ("*WWH*"), the district court invalidated the Act as facially unconstitutional.  The court overlooked that the facts in the instant case are remarkably different from those that occasioned the invalidation of the Texas statute in *WWH*.  Here, unlike in Texas, the Act does not impose a substantial burden on a large fraction of women under *WWH* and other controlling Supreme Court authority.  Careful review of the record reveals stark differences between the record before us and that which the Court considered in *WWH*.

Almost all Texas hospitals required that for a doctor to maintain privileges there, he or she had to admit a minimum number of patients annually.  Few Louisiana hospitals make that demand.  Because Texas doctors could not gain privileges, all but 8 of 40 clinics closed.  Here, only one doctor at one clinic is currently unable to obtain privileges; there is no evidence that any of the clinics will close as a result of the Act.  In Texas, the number of women forced to drive over 150 miles increased by 350%.  Driving distances will not increase in Louisiana.  Unlike the record in Louisiana, the record in Texas reflected no benefits from the legislation.  Finally, because of the closures, the remaining Texas clinics would have been overwhelmed, burdening every woman seeking an abortion.  In Louisiana, however, the cessation of one doctor's practice will affect, at most, only 30% of women, and even then not substantially.

That is only a summary.  As we explain in detail, other facts underscore how dramatically less the impact is in Louisiana than in Texas.  Because the Louisiana Act passes muster even under the stringent requirements of *WWH*

---

[1] La. Sess. Law Serv. Act 620 (H.B. 388), § 1(A)(2)(a).  Act 620 amended LA. REV. STAT. § 40:1299.35.2, recodified at § 40:1061.10.

No. 17-30397

and the other Supreme Court decisions by which we are strictly bound, we reverse and render a judgment of dismissal.

## I.

Act 620 requires "a physician performing or inducing an abortion" to "[h]ave active admitting privileges at a hospital that is located not further than thirty miles from the location at which the abortion is performed or induced and that provides obstetrical or gynecological health care services." LA. STAT. ANN. § 40:1061.10(A)(2)(a). "'[A]ctive admitting privileges' means that the physician is a member in good standing of the medical staff of a hospital that is currently licensed by the department, with the ability to admit a patient and to provide diagnostic and surgical services to such patient . . . ." *Id.* Each violation can result in a fine up to $4,000. *Id.* § 40:1061.10(A)(2)(c).[2]

Act 620 is premised on the state's interest in protecting maternal health. Introducing the Act, Representative Katrina Jackson explained, "[I]f you are going to perform abortions in the State of Louisiana, you're going to do so in a safe environment and in a safe manner that offers women the optimal protect-tion and care of their bodies." During consideration of the Act, the Louisiana Senate Committee on Health and Welfare heard testimony from women who had experienced complications during abortions and had been treated harshly by the provider. For example, Cindy Collins with Louisiana Abortion Recovery testified that when she underwent an abortion and began to hemorrhage, "the abortion doctor could see that something had gone wrong" but, instead of assisting her, "told [her] to get up and get out." She eventually required an

---

[2] Previously, Louisiana had required abortion clinics to have either at least one physician "present" with admitting privileges or "a written transfer agreement with a physician who has admitting privileges within the same town or city." *June Med. Servs. LLC v. Kliebert*, 250 F. Supp. 3d 27, 55 n.36 (M.D. La. 2017); former LA. ADMIN. CODE tit. 48, pt. I, § 4407(A)(3).

3

emergency dilation and curettage ("D&C"). Testimony also established numerous health and safety violations by Louisiana abortion clinics.

In addition to the concern for maternal health expressed at the hearing, Louisiana has an underlying interest in protecting unborn life. The state has codified its intent to "regulate abortion to the extent permitted." LA. STAT. ANN. § 40:1061.8. Its longstanding policy is that "the unborn child is a human being from the time of conception and is, therefore, a legal person . . . entitled to the right to life." *Id.* And, Louisiana enacted a trigger law such that "if those decisions of the United States Supreme Court [legalizing abortion] are ever reversed or modified or the United States Constitution is amended to allow protection of the unborn then the former policy of this State to prohibit abortions shall be enforced." *Id.*

## A.

Act 620 was set to become effective September 14, 2014, but on August 22, 2014, Bossier Medical Suite ("Bossier"), Causeway Clinic ("Causeway"), Hope Medical Group for Women ("Hope"),[3] and two abortion doctors—Doe 1 and Doe 2[4]— (collectively "June Medical") sued to enjoin the Act,[5] mounting a facial challenge, claiming that the Act placed an undue burden on women's access to abortions. The district court entered a temporary restraining order

---

[3] Bossier and Causeway eventually ceased operation and dropped out of the litigation. June Medical Services, L.L.C., does business as Hope. For simplicity, we refer to the plaintiffs collectively as June Medical.

[4] The district court took the unusual step of placing the doctors' names under seal— but, as the record demonstrates, their identities are well known. Because the doctors are referred to only as Doe 1 through Doe 6, we use masculine references, though some of them are women.

[5] After the first suit was filed, Women's Health Care Center, Inc. ("Women's" or "Women's Health"), Delta Clinic of Baton Rouge, Inc. ("Delta"), and Doe 5 and Doe 6 filed a separate suit. The two cases were consolidated in September 2014. In December 2014, however, these plaintiffs voluntarily dismissed their suit without prejudice.

No. 17-30397

allowing the doctors to seek privileges during the preliminary-injunction pro-ceedings.[6] After a bench trial, the court granted a preliminary injunction on January 26, 2016,[7] and denied a stay pending appeal.[8]

Louisiana requested and received from this court an emergency stay[9] that the Supreme Court vacated on March 4, 2016.[10] After the Supreme Court decided *WWH*, we remanded "so that the district court can engage in additional fact finding required by [*WWH*]."[11] The district court entered final judgment April 26, 2017, permanently enjoining the Act. The court found "minimal" health benefits but "substantial burdens" and ruled the Act unconstitutional on its face under *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), and *WWH*.[12] Louisiana appeals.

## B.

At the time of enactment, only five abortion clinics operated in Louisi-ana, and only six doctors performed elective abortions, of whom only one had qualifying admitting privileges. Since the enactment, two clinics have closed for reasons unrelated to the Act, and at least one doctor has obtained qualifying privileges. The analysis is fact-bound, as required by *WWH*, 136 S. Ct. at 2310, so we begin with a detailed overview of each clinic and the abortion doctors it employs.

---

[6] *June Med. Servs., LLC v. Caldwell*, No. 3:14-CV-00525-JWD-RLB, 2014 WL 4296679 (M.D. La. Aug. 31, 2014).

[7] *June Med. Servs., LLC v. Kliebert*, 158 F. Supp. 3d 473 (M.D. La. 2016).

[8] *June Med. Servs. LLC v. Kliebert*, No 3:14-00525-JWD-RLB, 2016 WL 617444 (M.D. La. Feb. 16, 2016)

[9] *June Med. Servs., L.L.C. v. Gee*, 814 F.3d 319 (5th Cir. 2016).

[10] *June Med. Servs., L.L.C. v. Gee*, 136 S. Ct. 1354 (2016) (mem.).

[11] *June Med. Servs., L.L.C. v. Gee*, No. 16-30116 (5th Cir. Aug. 24, 2016) (per curiam).

[12] *June Med. Servs.*, 250 F. Supp. 3d at 86.

No. 17-30397

### 1. The Causeway Clinic

Causeway opened in 1999 and was located in Metairie, a suburb of New Orleans. It closed February 10, 2016, for reasons not disclosed in this record.[13] It had provided only surgical abortions during the first and second trimesters. Between 2009 and mid-2014, about 10,836 abortions were performed there. Causeway employed two abortion doctors, Doe 2 and Doe 4, neither of whom held admitting privileges at the time of Act 620's enactment. Within 30 miles of Causeway's former location, there are 10 qualifying hospitals.

### a. Doe 2

Doe 2 is a board-certified OB/GYN who has been performing abortions since 1980.[14] He is the only doctor in Louisiana willing to provide abortions after 18 weeks up to the legal limit of 21 weeks, 6 days.[15] At Causeway, Doe 2 performed only surgical abortions between 6 weeks and 21 weeks, 6 days. He worked 2 weekends a month and performed 25% of the clinic's abortions. In 2014, he estimated he performed about 450 abortions at Causeway, the majority being first-trimester terminations.

From 2009 through mid-2014, Doe 2 had only two patients who required hospitalization.[16] In one instance, during a second-trimester procedure, the

---

[13] Nothing in the record suggests—nor does any party contend—that Causeway closed as a result of Act 620.

[14] Information about Doe 2 is from his court testimony, his three declarations, and the declaration of Robert Gross, Vice President of the Bossier and Causeway Clinics.

[15] Since this litigation began, Louisiana has banned abortions after 15 weeks. *See* S.B. 181, 2018 Leg., Reg. Sess. (La. 2018); *see also*, Anthony Izaguirre, *Ban on Abortions after 15 Weeks Signed into Law in Louisiana, but There's One Hurdle Left*, THE ADVOCATE (May 30, 2018, 1:19 PM), http://www.theadvocate.com/baton_rouge/news/politics/legislature/-article_fac56312-6435-11e8-b451-275614090005.html. The law will not take effect unless Mississippi's similar ban is upheld. *Id.*; Cassy Fiano, *Great News: Louisiana Governor Signs Law Banning Abortions after 15 Weeks*, LIVEACTION (May 30, 2018, 4:29 PM), http://www.liveaction.org/news/louisiana-governor-bans-abortions-15-weeks.

[16] Doe 2 later testified that over his entire career "more than 10, less than 20" women

No. 17-30397

woman experienced heavy vaginal and intra-abdominal bleeding from a rupture of her incision from a prior C-Section. Doe 2 called 9-1-1 and sent her charts and a note explaining the situation to the emergency room doctor. Doe 2 also called the doctor before the woman's arrival to explain the situation and visited her in the hospital after the surgery.

The second instance was also a second-trimester termination. The woman experienced some bleeding from uterine atony, and though Doe 2 believed it was non-critical bleeding, he called 9-1-1 to be safe. Though he did not have admitting privileges before the Act's effective date, Doe 2 has since secured limited, non-qualifying[17] privileges at Tulane in New Orleans.[18]

### b. Doe 4

Doe 4 is 82 years old and a board-certified OB/GYN with over 51 years' experience.[19] He once provided abortions at the Acadian clinic but stopped in

---

required hospitalization.

[17] Non-qualifying privileges are those that do not meet the requirements of Act 620.

[18] Tulane granted privileges at both its Downtown and Lakeside facilities. The former facility is in New Orleans, the latter in Metairie. The parties dispute whether the privileges qualify under the Act.

Louisiana submitted a signed declaration by then-Secretary of Louisiana Department of Health and Hospitals, Kathy Kliebert, averring that the privileges qualify under the Act. Plaintiffs respond that the Act requires the doctor be able to admit *and* "provide diagnostic and surgical services." Tulane granted Doe 2 the ability to "admit." Once the patient is admitted, however, a Tulane doctor must take over care. Doe 2 testified that his understanding is that "if [he has] to put a patient into Tulane Medical Center, [he] will be on record as the admitting physician, but they immediately take over the care of that patient." He believes he "would be the admitting physician of record, but they will be the treating physicians."

In response, Louisiana points to an email sent by Tulane after Doe 2 received his letter awarding him limited privileges. It claims that email clarifies the nature of the privileges: "You will be the admitting physician. We will be the consulting physician." As discussed *infra*, plaintiffs are correct that Doe 2's privileges do not qualify.

[19] Doe 4 did not testify in court. Information is primarily from his declaration, his deposition, the declaration of Gross, and a status report.

7

2003 when that clinic closed.  Though he retired from practice in 2012, Causeway requested in 2013 that he fill in for a doctor who had fallen ill.  He agreed and provided abortions (for the first time in ten years) at Causeway until its closure.  Other than ensuring that Doe 4 remained board-certified, had a DEA license, and "was in good standing with the medicals," Doe 4 knows of no other review undertaken, similar to hospitals' credentialing process, that ensures a doctor has the requisite skills and capacity to perform relevant procedures.

Doe 4 worked Thursdays and every other weekend and performed 75% of the abortions that were done at the Causeway Clinic; all of his were first-trimester terminations.  Doe 4 "imagine[s] [he performs] about a thousand, fifteen hundred" abortions annually.  He explained he would provide from 5 to 15 abortions per day and that there was not a high demand or "a significant volume of business" at the Causeway clinic.

Since resuming his abortion practice in 2013, Doe 4 has had one patient experience heavy bleeding caused by an atonic uterus.  An ambulance had to be called, as the woman was not responding.  Doe 4 thinks he "sent a note with her or a copy of her chart went with her to the emergency room," then he explained the situation to the doctor over the phone.

Doe 4 does not currently possess admitting privileges but did apply to Ochsner at Kenner.  He applied only to Ochsner because he "worked at Ochsner before in Baton Rouge and [he] had a doctor who had privileges at Ochsner who would certify that he would back up for" him.  Other than a request for additional information (which he provided) and learning that Ochsner had spoken to one of his references, Doe 4 did not receive a decision on his application, though he "think[s] he [has] a very good chance of getting privileges there."  Doe 4 agreed that requiring the covering doctor to be an OB/GYN is

not "an overburdensome requirement for admitting privileges."[20]  But he does not know any OB/GYNs in the area because "[a]ll the doctors that [he has] known, they've kind of died out. . . . [or] are no longer in practice."

Upon Causeway's closure, Doe 4 stopped performing abortions and no longer intends to seek admitting privileges.  Nothing in the record suggests he has been asked to continue at any other clinic or that the Act has caused him not to move to another clinic.  In fact, during his deposition (when still working at Causeway) he was asked whether he would work at other clinics if requested, and he stated he was already "working more than enough for [his] age" and "do[es]n't want to work more."  That would be his "personal choice."

## 2.  The Bossier Clinic

Bossier Medical Suite opened in 1980 and was located in Bossier City in Northwestern Louisiana.  It closed on March 30, 2017, for reasons not reflected in this record.[21]  It provided both medication and surgical abortions[22] during the first and second trimesters.  Between 2009 and mid-2014, about 4,171

---

[20] The requirement to have a covering physician is not mandated by Act 620 but is a part of several hospitals' criteria for gaining privilege.  A covering doctor serves as a back-up in the event that the admitting doctor is unavailable.

[21] As with Causeway, nothing in the record or in any party's assertions suggests that Bossier's closing was related to the enactment of Act 620.

[22] "Medication abortion involves the use of a combination of two drugs, usually mifepristone and misoprostol.  . . . A woman typically takes mifepristone at the clinic and then takes misoprostol at home.  Medication abortion requires no anesthesia or sedation." *Kliebert*, 250 F. Supp. 3d at 62 (citations omitted).  The pills induce hemorrhaging, which causes the uterus to shed its lining as in a menstrual period and thereby causing the death of the unborn child. *See id.*

Surgical abortions during the first trimester are most commonly vacuum aspirations, in which the physician inserts a vacuum into the woman's uterus to remove the unborn child.  Second-trimester surgical abortions are most commonly dilation and evacuation procedures in which the physician dilates the woman's cervix, inserts instruments to detach and tear apart the unborn child from the placenta, removes the body piece by piece, scrapes the uterus clean, and suctions out the child and remaining fetal tissue. *See generally Gonzales v. Carhart*, 550 U.S. 124, 134–36 (2007).

abortions were performed there.  Bossier employed one abortion doctor, Doe 2, who did not hold admitting privileges at the time of the Act's enactment.[23] There are 5 qualifying hospitals within 30 miles of Bossier.

In addition to his work at Causeway, Doe 2 provided medical and surgical abortions at Bossier, his primary clinic.  He worked there Tuesday through Saturday when he was not going to Causeway and Tuesday, Wednesday, and Thursday when he was going to Causeway.  In 2014, he performed about 550 abortions at Bossier, at least 90% of which were first-trimester terminations.

Doe 2 applied for privileges within thirty miles of the Bossier clinic. Because he already had consulting privileges at University Health, Doe 2 inquired about upgrading to courtesy privileges.  He says that the "head of the department [of OB/GYN] . . . was very reticent and reluctant to consider that because of the political nature of" abortion.  The department head spoke with the Dean and then informed Doe 2 "that [he was] not going to go beyond [his] [consulting] privileges."

Doe 2 also applied to Willis Knighton Bossier City Hospital ("WKBC") on May 12, 2014.  WKBC sent a letter indicating that "applicants must demonstrate they have been actively practicing Obstetrics/Gynecology (in your case only Gynecology) in the past 12 months."  "In order for the Panel to sufficiently assess current clinical competence," WKBC requested that Doe 2 "submit documentation, which should include operative notes and outcomes, of cases performed within the past 12 months for the specific procedures you are requesting on the privilege request form."  Doe 2 testified that "it would have

---

[23] Doe 2 does have "consulting privileges" at University Health within thirty miles of Bossier and Hope.  Those privileges, however, are distinct from "courtesy" or "admitting" privileges.  Consulting privileges do not allow Doe 2 to admit or treat patients.  As the district court noted during Doe 2's testimony, he originally called his privileges "courtesy" privileges but later corrected the mistaken terminology.

been impossible for [him] to submit that information . . . because [he has not] done any in-hospital work in ten years, so there is no body of hospitalized patients that [he has] to draw from."

Doe 2 sent an email to WKBC indicating that "[o]ver the past 12 months [he] performed the procedures [he is] requesting privileges for several hundred times with no major complications" at Bossier. Instead of attaching documentation to that email, however, he merely invited "any qualified person who would like to visit the Clinic and examine the records" to do so. Doe 2 initially testified that was his only response, but he later vaguely contradicted himself on re-direct,[24] prompting the district court to question him directly to determine whether he had submitted any information. In response, Doe 2 stated, "I actually called . . . and [they] said send 20 representative cases and that's what I did."

It remains unclear whether Doe 2 sent a list of cases, as no document supporting that contention was ever supplied. Even the district court, in its thoroughly documented opinion, did not point to any evidence other than Doe 2's contradictory testimony. WKBC responded via letter that his answer (whatever it was) was not satisfactory. WKBC stated that the "application remains incomplete and cannot be processed" until the pertinent list of cases was submitted. Thus, Doe 2 has not been able to secure privileges at WKBC.

Doe 2 has not applied, nor does he intend to apply, to any other hospital within thirty miles of Bossier. For instance, he refused to apply to Christus Schumpert. He says applying would be fruitless because the Catholic hospital

---

[24] Plaintiffs' attorney asked him if he "did more than just invite them to come to the clinic." Doe 2 responded "Yes." But, he previously testified that he never submitted any specific documentation after his email inviting someone to come review the documents, and plaintiffs never pointed to any document to support that statement.

would be unlikely to grant him privileges on account of the nature of his work.

That assumption is belied by Doe 2's own personal history.  He previously secured privileges at that hospital when he had both an OB/GYN practice and an abortion practice.  Furthermore, as Doe 2 is aware, Doe 3 maintains privileges at that hospital.

Doe 2 also said he had no intention of applying to Minden Hospital because it was "very close to the [geographic] limits," is "a smaller hospital," and he "[doesn't] really know anyone there."  Though a smaller hospital and close to the thirty-mile limit, Minden is a qualifying hospital under the Act.

### 3. Delta Clinic

Delta, in Baton Rouge, has offered abortions since 2001.  It provides medication and surgical abortions up to the seventeenth week.[25]  Between 2009 and mid-2014, it provided about 8,800 abortions.  Two of those patients required direct hospital transfer, one because she "decided during a procedure that she no longer wanted to have the abortion," and "the physician had already begun the process."  Delta employs one abortion doctor,[26] Doe 5, who does not hold admitting privileges within thirty miles of Delta.  Four qualifying hospitals are located within thirty miles of Delta.

Doe 5 is a board-certified OB/GYN who has performed abortions since April 2012, when he started working at the Delta and Women's clinics.[27]  He began working there after receiving a letter the clinics sent to all licensed

---

[25] The declaration and deposition of Sylvia Cochran, the Administrator of the Delta and Women's clinics, are unclear on this point.  In one she stated through the seventeenth week, while in the other she stated up to sixteen weeks.

[26] Though Doe 6 serves as medical director for Delta Clinic, he stopped performing abortions there in 2012.

[27] Doe 5 did not testify in court.  The information about him is primarily from his declaration, his deposition, and Cochran's declaration and deposition.

physicians in Louisiana advertising the open position. Doe 5 is at Delta on Tuesdays and Thursdays but works additional days when necessary. It does not appear that Doe 5 maintains a separate OB/GYN practice.

In 2013, Doe 5 performed approximately 2,000 abortions at Delta. He has performed abortions up to 18 weeks' gestation but will not go beyond that point. By week 18, the baby is formed to a certain degree that it is beyond what he "feel[s] comfortable looking at and dealing with." In a typical week, between both clinics, he performs "between 40 and 60 of the surgical abortions and 20 to 30 of the medical . . . abortions." Between the clinics, he believes he performs about 6 second-trimester abortions per week. No patient has required a direct hospital transfer.

Doe 5 has not secured qualifying privileges in Baton Rouge. He has applied to three hospitals: Woman's Hospital, Baton Rouge General Medical Center, and Lane Regional Medical Center.[28] He has not heard back from the latter two but did receive a positive response from Woman's Hospital.

Woman's Hospital indicated that it would grant privileges to Doe 5 once he identified a doctor willing to cover his service when he is unavailable. In fact, Doe 5 explained that Woman's Hospital cannot deny him privileges once he does that because, "from what [he is] told, [he] meet[s] all the qualifications. And as long as [he] meet[s] those, they can't deny [his application]." Delta has a transfer agreement with a physician at Woman's Hospital, so Doe 5 asked that doctor whether he would be his covering doctor. That doctor refused because he did not want his information or relationship with the clinic to become public. Doe 5 does not appear to have reached out to anyone else, thus his application will remain pending until he takes further action.

---

[28] Doe 5 did not apply to the fourth qualifying hospital, Ochsner, because he did not know any physicians there.

Doe 5 has not followed up with the other two hospitals on the status of his applications. He says he is waiting for a complete denial from Woman's Hospital before doing so. But, as explained, Woman's Hospital marked his application as pending until he finds someone to serve as a covering physician. He has contrived a situation in which it is impossible for him to obtain privileges. Woman's Hospital will not grant or deny privileges until he takes action to find a covering physician—something solely within his control. Yet, he refuses to follow up with other hospitals until Woman's Hospital takes action, something it cannot do until after Doe 5 provides further information.

### 4. The Hope Clinic

Hope opened in 1980 and is located in Shreveport. It provides surgical and medication abortions through 16 weeks[29]; it performs about 3,000 abortions per year. In the past 20 years, 4 patients at Hope required hospitalization, with 2 of those occurring in the past 5 years. The clinic offers abortions 3 days a week. On busy days, it provides up to 30 terminations, but its administrator, Kathaleen Pittman, testified that it could provide up to 60, though she thought that would be "quite a bit."

At the time of trial, Hope employed two doctors, Doe 1 and Doe 3, to perform abortions.[30] Following the closures of Causeway and Bossier (which occurred after the trial concluded), Hope also employs Doe 2. Because Doe 2 began working at Hope post-trial, all estimates in the record for Hope encompass only Doe 1 and Doe 3.

Doe 3 had admitting privileges before the enactment of Act 620 and

---

[29] According to Hope's administrator, Kathaleen Pittman, 69.9% of Hope's patients are Louisiana residents, 18.7% Texas, 5.6% Arkansas, and 1.2% Mississippi.

[30] Hope employs two other doctors for counseling and post-operative examinations.

## No. 17-30397

remains Hope's only abortion doctor who has privileges. There are 4 qualifying hospitals within 30 miles of Hope.

### a. Doe 1

Doe 1 is not an OB/GYN but, instead, is board certified in Family Medicine and Addiction Medicine.[31] He has worked at Hope as a counseling physician since 2006 but began providing abortions only in 2008. He has never had a family-medicine practice. He is at Hope 3 days a week and provides about 71% of Hope's abortions. In a given month, Doe 1 generally performs 250–300 abortions. He performs medication abortions up to 8 weeks and surgical abortions up to 13 weeks. Between 2009 and 2014, he has had only one woman require hospitalization.

Doe 1 applied to three of the four qualifying hospitals: WKBC, Christus Health, and Minden. He originally applied to WKBC to receive privileges via their Addiction Department, as he maintains a private practice in addiction medicine. WKBC could not grant him privileges in that field because its bylaws require "successfully complet[ing] a residency training program . . . in the specialty in which" privileges are sought. Doe 1 did not complete a residency in addiction medicine because no such residency program existed when he graduated medical school.

Doe 1 then submitted a new application requesting privileges in Family Medicine. WKBC requested that he "submit documentation of hospital admissions and management of patients 18 years of age or older for the past

---

[31] Information about Doe 1 is primarily from his two declarations, his trial testimony, the trial testimony of Doe 3, and Pittman's declaration and trial testimony. Doe 1 attended medical school in Hungary and the Netherlands. A separate bill, passed in 2016, requires abortion providers to be certified OB/GYNs or to be residents practicing under the supervision of such a certified physician. *See* Act 98, 2016 Leg., Reg. Sess. (La. 2016) (codified at LA. STAT. ANN. § 40:1061.10(A)(1) (2016)).

12 months." It also requested him to explain further the types of complications he expects to treat at WKBC. He responded with a list of all patients he treated when working at a hospital from July 2008 to May 2009. He indicated that he had not had to admit any patient for abortion-related complications in the preceding twelve months, though he has referred women to other doctors in a few situations. WKBC has not responded to that update.

Doe 1 corresponded with Christus Health at length. Christus requested additional information, and Doe 1 provided almost all such information. Christus requested Doe 1 come in to receive an ID badge to complete the application, but when he tried to do so, he was told that he could not receive the badge because he was not applying for the right privileges. He then received a letter saying his application remained incomplete for lack of a badge. That letter also said his application had been pending for 120 days, and applications pending for longer than 90 days were deemed withdrawn. Doe 1 admitted he waited until the very end of the 90-day period to try for the badge. He claims he was later told over the phone that he qualified only for a caregiver position, which would not include admitting privileges. That is not supported by documentation.

Minden Hospital informed Doe 1 that it had no "need for a satellite primary care physician." The one hospital to which he did not apply, University Health, extends privileges by invitation only. He spoke to the chair of the Family Medicine Department, and, although the chair indicated an invitation would be forthcoming, Doe 1 was later told that there was "resistance" to extending him an invitation.

### b. Doe 2

Doe 2 provided abortions at Hope for a number of years before moving to the Bossier and Causeway clinics. Once those clinics closed, Doe 2 returned to

Hope. He currently provides abortions at Hope when Doe 1 or Doe 3 is absent.

### c. Doe 3

Doe 3 is a board-certified OB/GYN who has been performing abortions since 1981.[32] He is the Chief Medical Officer at Hope. Of note, he has trained other doctors to provide abortions. Three of those are not OB/GYNs. One is a radiologist, another an ophthalmologist. The third, Doe 1, specialized in general family medicine. Doe 3 hired all three and was the only one to evaluate their credentials. He admits he neither performed background checks nor inquired into their previous training.

Doe 3 performs about 29% of the abortions at Hope. He provides both surgical and medication abortions two days a week. On average he sees 20–30 patients a week but has seen up to 64. If everything goes well, he can perform "about six procedures in one hour." Doe 3 says he cannot not devote any more time to Hope.

In the past twenty years, Doe 3 has had three patients require hospitalization, and he knows of a fourth from Doe 1. One woman had a perforated uterus, and Doe 3 accompanied her to the hospital and performed the necessary procedures. Another woman had heavy bleeding. The third had placenta accrete, "a very dangerous situation because you cannot get the bleeding to stop." He implied that he also admitted her and performed her procedures. The fourth woman, Doe 1's patient, had a perforated uterus. Doe 3, who was on call at the hospital, admitted her and performed her procedures.

Doe 3 is active staff, with admitting privileges at WKBC and Christus Schumpert Hospital. He maintains those privileges on account of his private

---

[32] Information about Doe 3 is primarily from his two declarations, his trial testimony, and the declaration and trial testimony of Administrator Pittman.

No. 17-30397

OB/GYN practice. In his declaration, Doe 3 stated that he will cease performing abortions "if he is the only provider in Louisiana with admitting privileges." Curiously, after Doe 5 obtained qualifying privileges in New Orleans—such that Doe 3 would no longer be at risk of being "the only provider in Louisiana"—Doe 3 testified that he does not "believe [he] will continue" if he is "the last physician providing abortions in *Northern* Louisiana" (emphasis added).

### 5. Women's Health

Women's Health, in New Orleans, began providing abortions in 2001. It performs abortions through the seventeenth week of pregnancy,[33] and it offers both medication and surgical abortions. Between 2009 and mid-2014, about 7,400 abortions were performed there, with 2,300 in 2013 alone.[34] Of those patients, 2 required direct hospital transfer. Women's employs 2 abortion doctors, Doe 5 and Doe 6, neither of whom had admitting privileges at the time of Act 620's enactment. Doe 5 has since secured qualifying privileges at Touro Infirmary. There are 9 qualifying hospitals within 30 miles of Women's.

### a. Doe 5

Doe 5 began working at Women's in 2012. He works two days a week unless it is busy, in which case he may come in extra days. In 2013, Doe 5 performed approximately 40% of the abortions provided by Women's, all of which were surgical procedures. As noted previously, Doe 5 has secured qualifying privileges at Touro, which is within thirty miles of Women's.[35]

---

[33] Administrator Cochran's declaration and deposition are a bit confusing. In one she says through the seventeenth week, while in the other she says up to sixteen weeks.

[34] That 2013 number is according to Doe 5. Cochran said in her deposition that around 1,200 abortions are performed annually.

[35] Doe 5 claims to fear that Touro could revoke his privileges because people have

No. 17-30397

b. Doe 6

Doe 6 is a board-certified OB/GYN who has been performing abortions since 2002.[36] He began working at Women's and Delta in 2002 and has been the medical director of both since 2008. In 2013, he provided about 60% of the abortions occurring at Women's, which represents the percentage of medication abortions performed there. In that year, Doe 6 provided approximately 1,300 medication abortions at Women's. In his ten years at these clinics, he has had two patients require direct hospital transfer.

Doe 6 has not secured privileges. He applied to only one hospital, East Jefferson General Hospital ("EJGH"), and has not received a response. He inquired at Tulane but claims he "was told that [he] should not bother to apply because they would not grant privileges to [him] because [he has] not had hospital admitting privileges since August 2005."[37]

II.

On the above facts, the district court found that all doctors had put forth a good-faith effort to obtain privileges and that Doe 5 would be the sole remaining abortion provider in Louisiana were Act 620 to go into effect.[38] Because it concluded that that would substantially burden a large fraction of women, the court invalidated the law.

---

protested the grant; as he admits, however, Touro's attorney reached out following the protests to "reassure[] [him] that, you know, they could not—they would not take [his] privileges away" and that they would "release a statement to the protesters" to that effect.

[36] Doe 6 did not testify in court, nor was he deposed. Thus, information about him is primarily from his declaration and Cochran's declaration and deposition.

[37] Among other hospitals, Doe 6 had privileges at Tulane when he maintained a private gynecology practice.

[38] The district court found that Doe 5 would be the sole abortion provider in Southern Louisiana and, crediting Doe 3's testimony, that Doe 3 would cease practicing were Doe 3 the sole doctor in Northern Louisiana, leaving Doe 5 as the sole abortion provider in the state.

No. 17-30397

We review the district court's legal conclusions *de novo* and its factual findings for clear error.[39] A finding is "'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."[40] "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."[41]

A.

First we must resolve the appropriate framework for reviewing facial challenges to abortion statutes. As a general matter, "[f]acial challenges are disfavored." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). Louisiana says we should reverse because the district court used the wrong framework for evaluating a facial challenge and that we instead should follow *United States v. Salerno*, 481 U.S. 739, 745 (1987), under which plaintiffs "must establish that no set of circumstances exists under which the [law] would be valid."

June Medical urges, to the contrary, that *WWH* foreclosed using the *Salerno* framework in the abortion context. In *WWH*, 136 S. Ct. at 2313, 2318−20, the Court, reviewing an as-applied challenge, reversed and invalidated the law in its entirety, finding that a large fraction of women would be substantially burdened.

---

[39] *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott (Abbott II)*, 748 F.3d 583, 589 (5th Cir. 2014).

[40] *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

[41] *Id.* at 573−74.

Before *WWH*, this court viewed the standard for facial invalidation of abortion regulations as "uncertain."[42]  In *Lakey*, we explained that a plurality in *Casey*, 505 U.S. at 895, had concluded that a regulation was facially invalid if, "in a *large fraction of the cases* in which it is relevant, it will operate as a substantial obstacle."  *Lakey* 769 F.3d at 296 (quoting *Casey*, 505 U.S. at 895).  Earlier decisions, however, had used the "no set of circumstances" standard.  *Id.* (quoting *Rust v. Sullivan*, 500 U.S. 173, 183 (1990)).

In *WWH*, 136 S. Ct. at 2320, the Court eliminated the uncertainty and adopted the *Casey* plurality's large-fraction framework.  As the Eighth Circuit explained, "For [facial] challenges to abortion regulations, however, the Supreme Court has fashioned a different standard under which the plaintiff can prevail by demonstrating that 'in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice.'"[43]

Importantly, the Court in *WWH* clarified by limiting the "large fraction" to include only "those women for whom the provision is an actual rather than an irrelevant restriction."  *WWH*, 136 S. Ct. at 2320 (cleaned up) (quotation omitted).  "[C]ases in which [the provision at issue] is *relevant*" is a narrower category than "all women," "pregnant women," or even "*women seeking abortions* identified by the State."  *Id.* (quotation omitted).  For a law regulating only medication abortions, for example, the relevant denominator is not all women seeking any type of abortion, but only those potentially impacted (i.e.,

---

[42] *Abbott II*, 748 F.3d at 588; *see also Whole Woman's Health v. Lakey*, 769 F.3d 285, 295–96 (5th Cir.), *vacated in part*, 135 S. Ct. 399 (2014) (mem.).

[43] *Planned Parenthood of Ark. & E. Okla. v. Jegley*, 864 F.3d 953, 958 (8th Cir. 2017) (second alteration in original) (quoting *Casey*, 505 U.S. at 895), *cert. denied*, 138 S. Ct. 2573 (2018).

No. 17-30397

those seeking a medication abortion).[44]  In *WWH*, the Court treated the denominator as all women seeking abortions, but only because the statute at issue, Texas's H.B. 2, encompassed all types of abortions.[45]

Here, too, the relevant denominator to determine a "large fraction" is all women seeking abortions in Louisiana, as Act 620 applies to providers of both medication and surgical abortions.  Accordingly, to sustain the facial invalidation of Act 620, we would have to find that it substantially burdens a large fraction of all women seeking abortions in Louisiana.

## B.

The parties present conflicting interpretations of the legal standard for finding an undue burden under *WWH*.  June Medical frames *WWH*'s analysis as a balancing test:  "Where an abortion restriction's burdens outweigh its benefits, the burdens are 'undue' and unconstitutional."  Louisiana counters that *WWH* did not alter the well-known standard in *Casey*.

*WWH*'s analysis is rooted in *Casey*, 505 U.S. at 877, which defined an "undue burden" as "shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus."  The Court in *WWH* explained that *Casey* "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer."[46]

In *WWH*, 136 S. Ct. at 2309, the Court relied on *Casey*'s analyses of the

---

[44] *Id.* ("[B]ecause the [law] only applies to medication-abortion providers, the 'relevant denominator' here is women seeking medication abortions in Arkansas.").

[45] *WWH*, 136 S. Ct. at 2320 (stating that the relevant class was more limited than women of reproductive age and that Texas's H.B. 2 "involves restrictions applicable to all abortions").

[46] *Id.* at 2309 (citing *Casey*, 505 U.S. at 887–98) (instructing courts to "consider the existence or nonexistence of medical benefits" while performing an undue-burden analysis).

spousal-notification and parental-notification provisions. In parentheticals, it describes the decisional process as "balancing." *Id.* Consequently, "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." *Id.* (quoting *Casey*, 505 U.S. at 878).

There is no doubt that *WWH* imposes a balancing test, and Louisiana errs in denying that. It is not reasonable to read the language in *WWH*, quoted above, as announcing anything but a balancing test, especially given the Court's express use of the word "balancing" to describe *Casey*.[47]

Hewing to *WWH* and *Casey*, we recognize and apply a balancing test. Louisiana, however, is correct that it is not a "pure" balancing test under which *any* burden, no matter how slight, invalidates the law. Instead, the burden must still be substantial, as we will explain.

Quoting *Casey* as cited above, the *WWH* Court began by emphasizing that to fail constitutional scrutiny, a law must place "*a substantial obstacle* in the path of a woman seeking an abortion."[48] *Casey* expressly allows for the possibility that not every burden creates a "substantial obstacle."[49] Thus, even regulations with a minimal benefit are unconstitutional only where they present a substantial obstacle to abortion.[50]

---

[47] Justice Thomas, in dissent, recognized the sea change, stating that the opinion "reimagine[d] the undue-burden standard" and created a "free-form balancing test." *Id.* at 2323–24 (Thomas, J., dissenting).

[48] *WWH*, *id.* at 2300 (quoting *Casey*, 505 U.S. at 878).

[49] *Casey*, 505 U.S. at 874 ("[T]he incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it. Only where state regulation imposes an undue burden on a woman's ability . . . does the . . . State reach into the heart of the liberty protected by the Due Process Clause.").

[50] Our conclusion is in full accord with the Eighth Circuit's formulation in *Jegley*, a decision the Supreme Court recently declined to review. *Jegley* read *WWH* as finding that Texas H.B. 2's "numerous burdens *substantially* outweighed its benefits." *Jegley*, 864 F.3d

No. 17-30397

The proper reading of *WWH* is a combination of the views offered by June Medical and Louisiana:  A minimal burden even on a large fraction of women does not undermine the right to abortion.  To conclude otherwise would neuter *Casey*, and any reasonable reading of *WWH* shows that the Court only re-inforced what it had said in *Casey*.   Thus, we must weigh the benefits and burdens of Act 620 to determine whether it places a substantial obstacle in the path of a large fraction of women seeking abortions in Louisiana.

C.

We are of course bound by *WWH*'s holdings, announced in a case with a substantially similar statute but greatly dissimilar facts and geography.  We begin by summarizing the Court's close, fact-bound balancing analysis of the benefits and burdens in *WWH*—an analysis that led the Court to conclude that Texas's admitting-privileges requirement was unduly burdensome.

1.

The Court began by examining the benefits the admitting-privileges requirement might provide.  It noted that the purpose of Texas's law was to "ensure that women have easy access to a hospital should complications arise during an abortion procedure."  *WWH*, 136 S. Ct. at 2311.  The evidence the court examined to determine whether the law served its stated purpose included expert testimony and studies about abortions in the United States generally.  *Id.*  The Court explained that there was "nothing in Texas' record evidence that shows that, compared to prior law (which required a 'working arrangement' with a doctor with admitting privileges), the new law advanced Texas' legitimate interest in protecting women's health."  *Id.*  The Court specifically noted that Texas could not point to "a single instance in which the

at 958 (emphasis added).

new requirement would have helped even one woman obtain better treatment." *Id.*

Further, the Court found that the privileges had no relationship to a doctor's ability. Instead, the privileges provision looked to discretionary factors such as clinical data requirements and residency requirements. One abortion doctor who had practiced for 38 years was unable to obtain privileges at any of the 7 hospitals within the required 30-mile radius of the clinic. *Id.* at 2312–13. Therefore, "[t]he admitting-privileges requirement does not serve any relevant credentialing function." *Id.* at 2313.

2.

*WWH* identified four burdens imposed by the admitting-privileges requirement. Primarily, it caused the closure of 80% of Texas's abortion clinics. Only 7 or 8 of the 40 remained. The Court looked to the timing of the closures as evidence of causation. When H.B. 2 began to be enforced, the number of clinics dropped to half, from 40 to 20. The day the requirement took effect, 11 more clinics closed. *Id.* at 2312.

Part of the reason for the closures was the difficulty of obtaining privileges. Many Texas hospitals conditioned admitting privileges on having a minimum number of patient admissions per year. *Id.* That created an almost-universal requirement that physicians with privileges maintain minimum annual admissions, constituting a *per se* bar to admission for most abortion doctors. The president of a Texas hospital testified that no doctor could get privileges near El Paso because not a single patient seeking an abortion had required transfer to a hospital in the past ten years. Thus, "doctors would be unable to maintain admitting privileges or obtain those privileges for the future." *Id.*

No. 17-30397

Closures in Texas caused the third burden: increased driving distances. After the closures, the number of women living more than 150 miles from a clinic rose from 86,000 to 400,000, an increase of 350%. The number of women living more than 200 miles from a clinic increased from 10,000 to 290,000, an increase of 2,800%. *Id.* at 2302, 2313. The Court "recognize[d] that increased driving distances do not always constitute an 'undue burden,'" *id.* at 2313, but stacking that burden on top of the others, "when viewed in light of the virtual absence of any health benefit," supported the finding of an undue burden. *Id.*

The final burden was decreased capacity—"fewer doctors, longer waiting times, and increased crowding." *Id.*[51] The Court used "common sense" to conclude that the remaining clinics could not expand their capacity fivefold to meet the demand for abortions. *Id.* at 2317. The remaining clinics would need to expand from providing 14,000 abortions per year to providing 60,000–72,000 per year. *Id.* The Court found that to be unrealistic because of the capacity currently carried by existing clinics and the lack of evidence that expansion was feasible. *Id.* at 2317–18.

### III.

Mirroring the fact-intensive review that the Supreme Court performed in *WWH*, we do the same in-depth analysis of the instant record, weighing both the benefits and the burdens of Act 620. Unlike Texas, Louisiana presents some evidence of a minimal benefit. And, unlike Texas, Louisiana presents far more detailed evidence of Act 620's impact on access to abortion. In light of the more developed record presented to the district court and to us, the district court—albeit with the best of intentions and after diligent effort—clearly and

---

[51] Though the Court more fully discussed that burden under its evaluation of the surgical-center requirement, the analysis applies equally to the district court's mistaken finding in this case that decreased capacity is a substantial obstacle.

No. 17-30397

reversibly erred.  In contrast to Texas's H.B. 2, Louisiana's Act 620 does not impose a substantial burden on a large fraction of women, so the facial challenge fails.[52]

## A.

The legislative history of Act 620 plainly evidences an intent to promote women's health.  Specifically, the Act seeks to accomplish that goal by ensuring a higher level of physician competence and by requiring continuity of care.

Texas presented no evidence that the credentialing function performed by hospitals differed from the credentialing performed by clinics.  The record for Louisiana contains testimony from abortion providers themselves, explaining that the hospitals perform more rigorous and intense background checks than do the clinics.  The record shows that clinics, beyond ensuring that the provider has a current medical license, do not appear to undertake any review of a provider's competency.  The clinics, unlike hospitals, do not even appear to perform criminal background checks.[53]

Finally, Louisiana explains that the Act brings the requirements

---

[52] We do not mean to say that the facial challenge fails only because the facts are less compelling in Louisiana than in Texas or that the facts in Texas are borderline such that any law imposing a burden even slightly less than in Texas would be immune to attack.  Instead, Act 620 passes muster independently and on its own terms.  We make continuing references to the Texas statute invalidated in *WWH* to emphasize the dramatically different circumstances that called for the opposite result for Texas and to show how it is that the Louisiana law plainly satisfies both *WWH* and *Casey*.

[53] Testimony illustrates that hospitals verify an applicant's surgical ability, training, education, experience, practice record, and criminal history.  These factors are reviewed by a board of multiple physicians.  In contrast, to be hired at the clinics, abortion doctors in Louisiana do not have to undergo extensive background checks or review of their competency.  In fact, when the Act was passed, abortion providers did not even have to have OB/GYN credentials.  Doe 4, who had been retired for over a year before beginning to perform abortions for the first time in ten years, testified that the clinic did nothing to test his ability but asked only whether his license was still active.  And as stated, doctors who were trained for abortions at Hope included a radiologist and an ophthalmologist.

regarding outpatient abortion clinics into conformity with the *preexisting* requirement that physicians at ambulatory surgical centers ("ASCs") must have privileges at a hospital within the community. 48 LA. ADMIN. CODE § 4535(E)(1). Procedures performed at ASCs include upper and lower GI endoscopies, injections into the spinal cord, and orthopedic procedures.

Outpatient procedures such as dental surgeries and some D&C miscarriage-management procedures do not require the same admitting privileges. Those are governed by Title 46 of the regulatory code, whereas outpatient abortion facilities and ASCs are under Title 48. Louisiana's expert, who was involved in the drafting of Act 620, testified that the differential treatment was because of that grouping and did not single out abortion providers from other outpatient surgery centers. Thus, Louisiana was not attempting to target or single out abortion facilities.

In fact, it was just the opposite—the purpose of the Act was to bring them "into the same set of standards that apply to physicians providing similar types of services in [ASCs]."[54] The benefit from conformity was not presented in *WWH*,[55] nor were the reasons behind the conformity—continuity of care, qualifications, communication, and preventing abandonment of patients—directly

---

[54] Introducing the Act to the Committee, Representative Jackson explained,

[Act 620] puts no stringent requirements on those physicians performing abortions. It puts—it is not stringent, but it also puts less requirements than someone performing a surgical procedure, regardless of how minor it is, you must have—be on staff at a hospital. This bill doesn't go this far. It says that you must have admitting privileges at a hospital, which means if something goes wrong from your surgical procedure, you can call the hospital or follow your patient to the hospital and make sure they receive proper care. And I think that's just a commonsense method that we've always used with physicians who are set up in surgical centers. There's no doubt that abortion clinics are set up for the primary purpose of performing abortions. And so this bill cleans up, what I think that we all thought that the ambulatory surgical rules did, is make sure that the safety of women is intact.

[55] *WWH* did address Texas's ASC requirement that sought to bring abortion *facilities*

addressed.[56] Accordingly, unlike in *WWH*, the record here indicates that the admitting-privileges requirement performs a real, and previously unaddressed, credentialing function that promotes the wellbeing of women seeking abortion.

Still, the benefits conferred by Act 620 are not huge. Though we credit Louisiana's more robust record on the benefits side of the ledger, the district court did not clearly err in finding that Act 620 provides minimal benefits,

---

(not physician requirements) in line with regulations imposed on ASCs. That Texas requirement included such things as regulating air pressure and humidity, scrub facilities, having a one-way traffic pattern through the facility, special finishes for ceilings, walls, and floors, and the like. *See WWH*, 136 S. Ct. at 2315–16. The Court found that that provision carried no benefit, imposed prohibitive costs, and would require some clinics to rebuild entirely at a new, larger location. *Id.* at 2302–03 (summarizing the district court's findings, which the Supreme Court found not clearly erroneous, *id.* at 2315).

The Court further noted that, though many Texas ASCs enjoyed waivers of some of these requirements, no waivers or grandfathering exceptions had been granted to abortion facilities. *Id.* at 2308. Texas's ASC conformity requirement is not at all similar to saying (as in Act 620) that physicians at ASCs and doctors at abortion clinics both must have admitting privileges.

[56] Louisiana suggests two other benefits of Act 620. First, the state focuses on the history of numerous health and safety code violations at Delta and Hope as well as generally unsafe conditions (the legislative history had testimony of unsanitary conditions and protection of rapists). Though horrifying, these violations are unrelated to admitting privileges.

Second, though Texas could not point to any instance in which admitting privileges would prove useful, Louisiana presents evidence of several situations in which women required direct hospitalization. At least three of those involved Doe 3's acting as the admitting and treating physician. But there is no testimony or evidence indicating that, had Doe 3 not been available, the women's health would have suffered.

The Act's failure to solve the problem of a woman's going to an emergency room that does not have an OB/GYN specialist on site also substantially undermines this benefit. Act 620 requires abortion doctors to have admitting privileges at a hospital that provides OB/GYN services. LA. STAT. ANN. § 40:1061.10(A)(2)(a). Most complications occur well after the surgery. Consequently, a woman living outside the thirty-mile radius who must go to a more rural hospital, in the event of an emergency arising after leaving the clinic, would not be helped by the admitting-privileges requirement. A woman living inside that radius would already be transported to a hospital with the relevant specialist. Moreover, the state did not provide any instance in which a worse result occurred because the patient's abortion doctor did not possess admitting privileges. Thus, in balancing, we do not credit either of these proposed benefits.

No. 17-30397

given the current standard of care in highly specialized hospital settings. *See June Med. Servs.*, 250 F. Supp. 3d at 86.

B.

In *WWH*, the Court identified four obstacles erected by Texas's requirement of admitting privileges: closure of facilities, difficulty in obtaining privileges, driving distances, and clinic capacities. The Court decided not that any burden individually was sufficient but that the four dominoed to constitute a substantial burden.

The near impossibility of obtaining privileges was the first domino to fall. Had that difficulty not loomed, there would have been no facility closures, no increased driving distances, and no issues regarding clinic capacities. Given the high minimum admissions requirement at most Texas hospitals, that first burden was unavoidable.

Originally, Texas had 40 facilities and numerous abortion doctors. Because the doctors could not obtain privileges, the number of clinics fell from 40 to only 7 or 8. Those closures undoubtedly burdened almost all women seeking abortions in Texas as a result of capacity issues and increased driving distances.

Thus, everything turns on whether the privileges requirement actually would prevent doctors from practicing in Louisiana. If that domino does not fall, no other burdens result. So we review the difficulty facing the abortion providers and trace them back to the patients to determine whether Act 620 substantially burdens a large fraction of women seeking abortions.

The paucity of abortion facilities and abortion providers in Louisiana allows for a more nuanced analysis of the causal connection between Act 620 and its burden on women than was possible in *WWH*. For one, we can examine

each abortion doctor's efforts to comply with the requirements of Act 620. We also can look to the specific by-laws of the hospitals to which each applied. This more intricate analysis yields a richer picture of the statute's true impact, the sort of obstacle it imposed. And this methodology allows us to scrutinize more closely whether June Medical has met its burden.

We conclude that it has not. To the contrary, it has failed to establish a causal connection between the regulation and its burden—namely, doctors' inability to obtain admitting privileges. Specifically, there is insufficient evidence to conclude that, had the doctors put forth a good-faith effort to comply with Act 620, they would have been unable to obtain privileges. Instead, as discussed below, the vast majority largely sat on their hands, assuming that they would not qualify. Their inaction severs the chain of causation.

The district court inquired whether the doctors had put forth a good-faith effort, without which June Medical cannot establish the requisite causation between Act 620 and a doctor's inability to obtain privileges. And, as *WWH* emphasized, 136 S. Ct. at 2313, it is June Medical's burden to put forth affirmative evidence of causation. Were we not to require such causation, the independent choice of a single physician could determine the constitutionality of a law. Using this methodology, we conclude, given the entire weight of the evidence, that the district court clearly erred in saying that all doctors had put forth a good-faith effort to obtain privileges.

Unlike the litigants in *WWH*, who presented only generalities concerning admitting privileges, the parties here provide the bylaws for the relevant hospitals. The situation differs from the circumstances in *WWH* in that the majority of hospitals do not have a minimum number of required admissions that a doctor must have to maintain privileges. Instead, most hospitals have a competency requirement. Competency is evaluated either by requesting the doctor

to provide information about recent admissions at any other hospital or by having a provisional admittance period during which the hospital can personally observe and evaluate him. Although the grant of privileges remains discretionary, the death knell to Texas's H.B. 2 was the combination of discretion and minimum admission requirements—the latter of which is less prevalent in Louisiana.

### 1. Doe 1

The district court concluded that Doe 1 put forth a good-faith effort and could not obtain privileges. Doe 1 applied to three of four qualifying hospitals near Hope. WKBC has not responded. There appears to be an unresolved communication problem with Christus, so it is possible Doe 1 could obtain qualifying privileges there. The record is uncertain on this point, so we cannot say that the district court clearly erred in concluding that Doe 1 put forth a good-faith effort. Doe 1 was definitively rejected by Minden for reasons other than credentials. The fourth hospital, University Health, requires an invitation to apply, and the hospital declined to extend an invitation because of department resistance to staffing an abortion provider.

### 2. Doe 2

The district court erroneously concluded that Doe 2 put forth a good-faith effort. Doe 2, now a back-up abortion doctor at Hope in Shreveport,[57] inquired about privileges at two hospitals within thirty miles of Hope. He claims that University Health refused to extend an invitation because of his abortion practice. WKBC required he submit documentation of OB/GYN procedures performed within the past twelve months. Doe 2's testimony was contradictory

---

[57] Since Causeway's closure, Doe 2 does not provide abortions in New Orleans, nor is there evidence suggesting he will transition to the remaining New Orleans clinic, Women's Health.

on whether he supplied documentation. At the very least, he explained to WKBC that he "performed the procedures [he is] requesting privileges for several hundred times" at the Bossier clinic. WKBC responded that that did not suffice—but the record does not establish whether the deficiency was his email response or actual documentation of the Bossier cases.

It is possible that Doe 2 could obtain privileges at Christus, though he has not applied. He previously had privileges there, and Doe 3 currently maintains privileges there. Thus, Doe 2's theory that a Catholic hospital would not staff an abortion provider is blatantly contradicted by the record. Opposite to what the district court found, Christus and Minden remain open options.[58]

---

[58] Doe 2 applied to only one New Orleans-based hospital, Tulane, where he was granted privileges. The parties dispute whether Doe 2's privileges are sufficient, though the dispute is not particularly relevant given Causeway's closure. Act 620 mandates that an abortion doctor have "the ability to admit a patient and to provide diagnostic and surgical services to such patient . . . ." LA. STAT. ANN. § 40:1061.10(A)(2)(a). Under his current privileges, Doe 2 can admit patients at Tulane but must have another Tulane physician perform any surgical procedures.

Louisiana insists that is enough, and Secretary Kliebert signed a declaration stating as much. June Medical contests that the statute is unambiguous and contradicts Kliebert's suggestion.

June Medical correctly insists that the court is not obligated to defer to Kliebert's interpretation that the statute is unambiguous. To support its position demanding deference, Louisiana proffers one statement in the *Ex Parte Young* context that the court should not "instruct[] state officials on how to conform their conduct to state law." *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). June Medical counters by offering numerous citations to support the well-established notion that courts do not *blindly* defer to agency interpretations but instead ask whether that interpretation conflicts with the statutory text. For example, in *Voting for America, Inc. v. Steen*, the court emphasized its role as interpreting a statute to be constitutional if possible and, as part of that effort, to give the state official's interpretation "meaningful weight" as the "official charged with enforcing the statute." 732 F.3d 382, 387 (5th Cir. 2013) (quotations omitted). That deference, however, is to be extended only "so long as [the interpretation] does not conflict with the statutory text." *Id.* (quoting *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 895 (5th Cir. 2012) (per curiam)).

The Act is unambiguous: For admitting privileges, it requires that a physician be allowed actually to perform the surgical procedure. Doe 2 cannot do so under his current privileges at Tulane. Because Kliebert's interpretation conflicts with the statute's plain text, we do not defer. It is a separate question whether Doe 2 could obtain privileges that conform

No. 17-30397

### 3. Doe 3

Doe 3 already has privileges at two hospitals within thirty miles of Hope. Thus, the Act is not burdensome on him.

### 4. Doe 4

In order to return to retirement, Doe 4 has stopped pursuing privileges and came out of retirement to cover for a sick doctor. There is no evidence of causation, so we need not evaluate whether he could obtain privileges.

### 5. Doe 5

The district court erroneously concluded that Doe 5 put forth a good-faith effort in obtaining privileges for his practice at Delta. For his abortion practice at Women's, Doe 5 received admitting privileges at Touro, which is within thirty miles of Women's.

For his practice at Delta, Doe 5 applied to three nearby hospitals. Two have not responded, but, according to Doe 5, Woman's Hospital will grant him privileges once he finds a covering doctor. He mentions asking only one doctor to serve as his covering physician. That doctor declined, and Doe 5 provides no evidence that he has reached out, or intends to reach out, to other doctors. Though Woman's Hospital is awaiting Doe 5's further action, he inexplicably states he is waiting on Woman's Hospital's further action before following up on his other two applications. The most logical explanation for Doe 5's delay is that he is awaiting the result of this litigation before he acts.

As Doe 4 testified, finding a covering physician is not overly burdensome. Under the clear-error standard, looking to the entire weight of the evidence, we are left with the impression that Doe 5 is waiting for the outcome of this

_____

to the Act's requirements, either at Tulane or another hospital, but his current privileges are insufficient to satisfy the Act.

No. 17-30397

litigation to put forth an actual good-faith effort. That lackluster approach is insufficient for facial invalidation of the law. In light of Doe 5's failure to seek a covering physician, the district court clearly erred in finding that Doe 5 put forth a good-faith effort and that his application at Woman's Hospital was *de facto* denied. The Act is not overly burdensome on Doe 5.

### 6. Doe 6

The district court erroneously concluded that Doe 6 put forth a good-faith effort. Doe 6 applied to one hospital, EJGH, from which he has received no response. He was told by Tulane that his lack of recent admissions is likely a barrier, so he did not apply there.

But there are nine qualifying hospitals in the area. Moreover, he has not applied to Touro, where Doe 5 was able to obtain qualifying privileges. That lack of effort demonstrates the district court's clear error in finding that Doe 6 put forth a good-faith effort.

### 7. Conclusion

Given the evidence, only Doe 1 has put forth a good-faith effort to get admitting privileges. Doe 2, Doe 5, and Doe 6 could likely obtain privileges. Doe 3 is definitively not burdened.

At least three hospitals have proven willing to extend privileges. On the entire evidence, we are left with the definite and firm conviction that the district court erred in finding that only Doe 5 would be able to obtain privileges and that the application process creates particular hardships and obstacles for abortion providers in Louisiana.

### C.

In Texas, the admitting-privileges law caused 32 of the 40 clinics to close. In dramatic contrast, under the record presented to us, there is no evidence

that Louisiana facilities will close from Act 620.[59]  If the Act were to go into effect today, both Women's and Hope could remain open, though each would have only one qualified doctor.  Delta would be the only clinic required to close, as its only Doctor, Doe 5, does not have admitting privileges within 30 miles.  Because obtaining privileges is not overly burdensome, however, the fact that one clinic would have to close is not a substantial burden that can currently be attributed to Act 620 as distinguished from Doe 5's failure to put forth a good-faith effort.  And, because Doe 5 has a pending offer and probably will be able to obtain privileges, the only permissible finding, under this record, is that no clinics will likely be forced to close on account of the Act.

Doe 3 initially indicated that he would cease practicing if he is the only remaining abortion doctor in the *entire state*.  Once it became clear that at least one other doctor (Doe 5) had obtained privileges and would continue practicing, Doe 3's story changed.  He testified that he would now cease practicing were he the only remaining abortion provider in *northern* Louisiana.  If he leaves the practice today, Hope would close because Doe 1 and Doe 2 do not currently have privileges.  The closure, however, would also lack the requisite causation, as it rests on an independent personal choice.  Doe 3's shifting preference as to the number of remaining abortion providers is entirely independent of the admitting-privileges requirement.

The district court's contrary findings are clearly erroneous.[60]  To

---

[59] Causeway and Bossier closed for unrelated reasons.  Because of court action, the Act has never been enforced, and there is no evidence that those closures were related to its passage, so, as the district court said, they are not relevant to the burdens analysis.  *June Med. Servs.*, 250 F. Supp. 3d at 81.  This is in stark contrast to the record in Texas, where numerous clinics closed as a direct result of the statute.

[60] The district court also erroneously factored into its substantial-burden analysis that Louisiana is a strongly anti-abortion state.  The court found the culture relevant in two respects: individual actions taken by Louisiana citizens and other previously enacted abortion regulations.  Actions taken by individuals to protest abortion or to intimidate those who

No. 17-30397

attribute a doctor's cessation of practice to Act 620, his retirement must be caused by a direct inability to meet the legal requirements of the bill. Doe 5's inaction and Doe 3's personal choice to stop practicing cannot be legally attributed to Act 620. Departure from the standard of direct causation leads to a line-drawing problem that would allow unrelated decisions to inform the undue-burden inquiry. For the question of causation, although the "government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those obstacles."[61]

In *WWH*, 136 S. Ct. at 2313, the majority rejected the dissent's theory that the clinic closures could be attributed to some other cause and not H.B. 2. It did so because there was no evidence of such alternative causes in the record; accordingly, the dissent's theories were mere "speculation." *Id.* Here, by contrast, there was clear evidence in the record before the district court that various doctors failed to seek admitting privileges in good faith. Unlike in *WWH*, Act 620's impact was severed by an intervening cause: the doctors' failure to apply for privileges in a reasonable manner. Accordingly, there is an insufficient basis in the record to conclude that the law has prevented most of the doctors from gaining admitting privileges. Similarly, any clinic closures that result from the doctors' inaction cannot be attributed to Act 620.

---

perform it are not attributable to the state generally or to Act 620 in particular. The courts cannot consider them.

Further, other abortion regulations are unrelated to admitting privileges and therefore have no bearing on the constitutionality of Act 620. *See WWH*, 136 S. Ct. at 2300; *Casey*, 505 U.S. at 879 ("We now consider the separate statutory sections at issue."). The district court considered, for example, Louisiana's trigger law that expresses the legislature's intention to comply with Supreme Court law on abortion but to ban the practice should that law change. *See* LA. REV. STAT. § 40:1229.30. Louisiana has further requirements, such as an ultrasound, 24-hour waiting period, and informed consent. *See* LA. REV. STAT. §§ 40:1299.35.2B–D; 40:1299.35.2D(2); 40:1299.35.19.

[61] *K.P. v. LeBlanc*, 729 F.3d 427, 442 (5th Cir. 2013) (internal quotation marks omitted) (quoting *Harris v. McRae*, 448 U.S. 297, 316 (1980)).

No. 17-30397

D.

Although "increased driving distances do not always constitute an 'undue burden,'" they can be, under the right facts, "one additional burden, which, when taken together with others . . . and when viewed in light of the virtual absence of any health benefit," can constitute an undue burden. *WWH*, 136 S. Ct. at 2313 (citation omitted). Louisiana does not reflect such right facts. Because all three clinics could remain open, the Act will cause no increase in driving distance for any woman—an extremely important distinction from the record in Texas.

E.

Following the implementation of H.B. 2, the number of clinics in Texas decreased, as we have repeatedly noted, from 40 to only 7 or 8. The *WWH* Court expressed concern that open facilities would not be able to "meet the demand of the entire State." *Id.* at 2316 (internal quotation marks and citations omitted). In Texas, each open facility would have had to increase its abortions from 14,000 to 60,000 or 70,000—"an increase by a factor of about five." *Id.* The Court rejected the contention that facilities could expand to meet the demand absent facility-specific evidence. *Id.* at 2317–18. In Louisiana, however, because no clinics would close, there would be no increased strain on available facilities, as no clinic will have to absorb another's capacity.

Importantly, however, it will be nearly impossible for Doe 1 to obtain qualifying privileges. Therefore, we review the facts to determine whether the remaining abortion providers at Hope have the capacity to meet the demand Doe 1 currently satisfies.

Doe 1 practices at Hope alongside Doe 2 and Doe 3. Doe 1 testified that he performs about 2,100 abortions annually. Doe 2 fills in when Doe 1 or Doe 3 is unavailable. When Doe 2 served as the primary provider at Causeway and

No. 17-30397

Bossier, he performed 1,000 abortions per year. Doe 3 performs somewhere between 870 and 1,250 per year.[62]

If Doe 1 ceased performing abortions, Doe 2 could likely step in, as that is his current arrangement. Assuming Doe 2 performs at his previous capacity, there would be a gap of about 1,100 abortions at the Hope clinic. Split between Doe 2 and Doe 3, that is an additional 550 procedures per doctor per year. That is not overly burdensome, especially given Doe 3's testimony that he has performed up to 60 procedures per week and regularly performs up to 30.[63]

To put that number in perspective, the Court in *WWH* found unduly burdensome the expectation that 8 clinics could absorb the work of 40. Each remaining Texas abortion provider would have had to increase his capacity by a factor of 5. *WWH,* 136 S. Ct. at 2317. A fivefold increase for Doe 3 would mean performing 100–150 abortions per week instead of his usual 20–30.

In contrast, the loss of Doe 1 would require Doe 3 to perform only 5 extra procedures each day he currently works (2 days per week). Instead of performing 20–30 abortions per week, he would perform 30–40. It necessarily follows that a gap of 1,100 procedures per year—split between 2 doctors—does not begin to approach the capacity problem in *WWH* and is not a substantial burden.

---

[62] Hope's administrator testified that Hope provides 3,000 abortions per year and that Doe 3 covers 29% of those procedures, which would be 870. Doe 3 testified that he performs 20–30 procedures per week. Assuming an average of 25 procedures a week for 50 weeks, that is 1,250 procedures per year.

[63] The record provides a wealth of information about Doe 3's capacity, down to the number of abortions he has performed in a single hour. Our subsequent analysis draws heavily from that information in determining whether Does 2 and 3 have the capacity to absorb Doe 1's practice. Although the information about Doe 2 is not as painstakingly detailed, Doe 3 is a particularly apt comparator for understanding Doe 2's capacity, as they have the similar experience levels (both have been performing abortions in Louisiana since 1980 and 1981 respectively) and perform a similar number of abortions annually (approximately 1,000).

No. 17-30397

Consider, for example, Doe 3's testimony that he can perform up to 6 abortions per hour. Using that number, adding 1,100 abortions would require 183.3 hours per year, which is an extra 3.6 hours per week, or about 1.8 hours per day, assuming a two-day work week for 50 weeks of work. Divided between two doctors, that is 54 minutes per day. Under that estimation based on the facts in the record, the extra 54 minutes of procedure time is unlikely to result in an undue burden on women. At the very least, June Medical did not produce sufficient evidence to evince such a burden.

To put it another way, Doe 2 and Doe 3 will each need to perform an additional 550 procedures per year. That amounts to six extra abortions each day that Doe 3 currently works. Using his testimony that he can perform six abortions an hour, that load would not result in a substantial increase in wait times. Common sense dictates that an hour cannot be a substantial burden.

## F.

Though we have determined that no woman would be *unduly* and thus unconstitutionally burdened by Act 620,[64] we additionally hold that the law does not burden a large fraction of women. To quantify the burden of eliminating Doe 1, the large-fraction standard requires us to determine what percentage of women seeking abortions in Louisiana would be affected by Act 620.

As an initial matter, *WWH* is less than clear on how to delimit the numerator and denominator to define the relevant fraction. The Supreme Court has limited the denominator to only individuals whose abortion rights are burdened by the statute: It encompasses "those [women] for whom [the provision] is an *actual* rather than an irrelevant restriction." *Id.* (quoting

---

[64] *See Jegley*, 864 F.3d at 959 (finding the district court erred by failing to "define or estimate the number of women who would be *unduly* burdened" (emphasis added)).

*Casey*, 505 U.S. at 895) (emphasis added).

It is an open question whether the denominator is made up of those women who could potentially be burdened by the regulation or just those women who are actually burdened.[65]  Under the former, the numerator is then comprised of those women who are actually burdened by the regulation.[66] Then we would review whether those women are substantially burdened and whether that fraction is large.  Under the second interpretation, the numerator is comprised of those women who are *substantially* burdened by the

---

[65] The parties additionally dispute whether the denominator includes only Louisiana residents or all women who utilize Louisiana's clinics.  Louisiana contends that we review the impact of the Act on only *Louisiana* women, so that when considering capacity and the fraction of women burdened, the court should look only to that number.  June Medical retorts that limiting the calculation to only Louisiana women would violate the Privileges and Immunities Clause by discriminating against out-of-state residents seeking abortions in Louisiana.  It says that *WWH*, 136 S. Ct. at 2319, broadly considered the impact on "women seeking abortions in Texas."

A combination of the two theories is the better approach.  In *WWH*, when reviewing the burden in terms of driving distances, the Court focused on Texas women.  *WWH*, 136 S. Ct. at 2313 (looking at "the number of women living in *a county* more than 200 miles from a provider" (emphasis added)) (quoting *Whole Woman's Health v. Lakey*, 46 F. Supp. 3d 673, 681 & n.4 (W.D. Tex. 2014) (reviewing the impact of the regulation on women of reproductive age in Texas)).  Additionally, when discussing whether remaining Texas clinics could expand to meet the demand, the Court examined whether the "clinics could expand sufficiently to provide abortions for the 60,000 to 72,000 *Texas women* who sought them each year." *Id.* at 2317 (emphasis added).

But at the same time, the Court took a realistic approach to problems of capacity. Out-of-state women do utilize the clinics, which affects the service provided to Louisiana women.  Unless the clinic turns them away or gives priority to Louisiana women, the latter will be affected by capacity problems so long as out-of-state women utilize the facilities.  Thus, Louisiana women's access to abortion, and the standard of care, are affected by how many women in total are seeking abortions in Louisiana.  Therefore, when reviewing capacity, we look to the impact on Louisiana women *via* the number of abortions annually sought.

[66] *See Jegley*, 864 F.3d at 959 ("The court correctly held that individuals for whom the contract-physician requirement was an actual, rather than an irrelevant, restriction were women seeking medication abortions in Arkansas.  Nonetheless, it did not define or estimate the number of women who would be unduly burdened by the contract-physician requirement. Instead, it focused on amorphous groups of women to reach its conclusion that the Act was facially unconstitutional.").

No. 17-30397

regulation.[67]  And, then we would determine whether the resulting fraction is large.

We need not decide which interpretation is proper because June Medical failed to demonstrate that a large fraction of women are substantially burdened under either analysis.

1.

We start with the first interpretation—the reading most favorable for June Medical.  There are approximately 10,000 abortions performed annually in Louisiana, 3,000 of which are at Hope, where Doe 1 currently works.[68]  Thus, only 30% (or, less than one-third) of women seeking an abortion would face even a potential burden of increased wait times were Doe 1 to cease practicing.

The Supreme Court has not defined what constitutes a "large fraction," and the circuit courts have shed little light.  The Sixth Circuit determined that 12% was insufficient and that the large-fraction requirement is "more conceptual than mathematical."[69]  It concluded that "a large fraction exists when a statute renders it nearly impossible for the women actually affected by an abortion restriction to obtain an abortion."  *Cincinnati Women's*, 468 F.3d

---

[67] *See Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 374 (6th Cir. 2006) (comparing the number of women who would be ultimately deterred from getting an abortion by Ohio's regulation—those unconstitutionally burdened—with the total number of women who sought exceptions from the requirement—those actually burdened by the requirement).

[68] Even assuming Louisiana is correct and we should limit our analysis to the number of Louisiana women burdened by the Act, the outcome is the same.  Louisiana women account for 2,097 of Hope's annual abortions.  Louisiana women account for 7,000 annual abortions statewide.  Using these numbers, only 29.9% of Louisiana women could even potentially be burdened by the loss of Doe 1.

[69] *Cincinnati Women's*, 468 F.3d at 374; *see also Woman's Choice–E. Side Women's Clinic v. Newman*, 305 F.3d 684, 700 (7th Cir. 2002) (Coffey, J., concurring) (stating that a reduction of 10% to 13% in the number of abortions was not a large fraction and that a statute is impermissible only when the restrictions are "*severe*" and "*lead to 'significant' reductions in abortion rates*").

42

at 373. In other words, as "[o]ther circuits" have found, "a large fraction [exists only] when *practically all* of the affected women would face a *substantial* obstacle in obtaining an abortion."[70]

Thirty percent does not approach "practically all" women seeking abortions in Louisiana and cannot be deemed a large fraction for purposes of *WWH* or Act 620. A superficial reaction might be to think, to the contrary, that 30% is obviously large. A few easy examples show why that is not so. If 30% of a law school class failed the bar, we would say that is a large fraction. Conversely, if 30% passed the bar, we would think that small. Again, if 30% of children had food to eat for lunch today, we would think that a small fraction. But if 30% were without food, we would think that large. Thus what constitutes a large fraction requires identifying the starting point.

In every other area of the law, a facial challenge requires plaintiffs to establish a provision's unconstitutionality in every conceivable application. *See Salerno*, 481 U.S. at 745. In other words, they must demonstrate an unconstitutional burden on 100% of those impacted. Plaintiffs asserting abortion rights, however, are excused from that demanding standard and must show a substantial burden in only a large fraction of cases.

The shift from the usual standard to the large-fraction standard was intended to ease the burden on abortion plaintiffs relative to plaintiffs who bring challenges to other sorts of laws. There is a difference, however, between

---

[70] *Cincinnati Women's*, 468 F.3d at 373–74 (emphasis added) (noting that "[t]o date, no circuit has found an abortion restriction to be unconstitutional under *Casey*'s large-fraction test simply because some small percentage of the women actually affected by the restriction were unable to obtain an abortion"); *accord Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 201 (6th Cir. 1997) (explaining that the Supreme Court found unconstitutional a regulation that substantially burdened 70% of women actually affected). Those decisions preceded *WWH* but, unlike the Fifth Circuit, the Sixth Circuit had already adopted and applied the *Casey* plurality's large-fraction test. *See Cincinnati Women's*, 468 F.3d at 367.

cracking the door and holding it wide open.

It cannot be that we force a plaintiff asserting his right to a fair trial, to freedom from unconstitutional searches and seizures, to associate freely, or to exercise his religion freely, to shoulder the burden of demonstrating that there is *no possible* constitutional application of a law, while allowing an abortion plaintiff to succeed on a showing that the law is unconstitutional in less than one of three cases. Bearing a burden of 30% compared to the typical burden of 100% is not large. To conclude otherwise eviscerates the restrictions on a successful facial challenge.

Not only is 30% not a large fraction for purposes of *WWH* and Act 620, as already explained, any burden imposed by the Act is not substantial even on women within the 30%. The burden is only potential: Doe 1's capacity can easily be absorbed by the remaining abortion doctors. Even were that potential burden of increased wait times to materialize, it would not be substantial.

June Medical's challenge thus fails under this interpretation at both critical points. It first fails to establish that the women potentially impacted suffer an unconstitutional burden. And it further fails to show that this group of women constitutes a large fraction. Instead of demonstrating an undue burden on a large fraction of women, June Medical at most shows an insubstantial burden on a small fraction of women. That falls far short of a successful facial challenge.

2.

Under the second interpretation, June Medical fares even worse. The denominator of women actually burdened is limited to those 3,000 women who seek abortions annually at Hope Clinic. The numerator is limited to those women substantially burdened. Since we have already concluded that Act 620

effects no constitutional deprivation, the numerator encompasses no one.  In other words, the statute imposes an undue burden on 0% of women.  By definition, zero percent is not large.  Thus, June Medical cannot succeed on its facial challenge under this interpretation either.

## IV.

We are bound to apply *WWH*, which is highly fact-bound, and the records from Texas and Louisiana diverge in all relevant respects.  Act 620 results in a potential increase of 54 minutes at one of the state's clinics for at most 30% of women.  That is not a substantial burden at all, much less a substantial burden on a large fraction of women as is required to sustain a facial challenge.  Despite its diligent effort to apply *WWH* faithfully, the district court clearly erred in concluding otherwise.

The judgment is REVERSED, and a judgment of dismissal is RENDERED.

No. 17-30397

PATRICK E. HIGGINBOTHAM, Circuit Judge, dissenting:

Twenty-six years ago, the Supreme Court laid down the now familiar metric: "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden" on the exercise of that right.[1] Yet the majority today fails to meaningfully apply the undue burden test as articulated in *Casey* and clarified in *Whole Woman's Health* and fails to give the appropriate deference to the district court's opinion, essentially conducting a second trial of the facts on this cold appellate record. With respect, I must dissent.

I.

We are to "consider the burdens a law imposes on abortion access together with the benefits those laws confer."[2] While the majority correctly rejects Louisiana's untenable position that *WWH* does not require balancing, it then misapplies that balancing. As I will detail, Act 620 will substantially burden women's access to abortion with no demonstrable medical benefit. In reaching a contrary conclusion, the majority accepts the district court's findings of a want of benefits but offers a starkly different view of the burdens imposed.

On a robust trial record after conducting a six-day bench trial, the district court documented its findings of benefits and burdens in a lengthy and detailed opinion. The divergence between the findings of the district court and the majority is striking—a dissonance in findings of fact inexplicable to these

---

[1] *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 878 (1992).

[2] *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016) (rejecting Fifth Circuit's standard which might have been "read to imply that a district court should not consider the existence or nonexistence of medical benefits when considering whether a regulation of abortion constitutes an undue burden").

No. 17-30397

eyes as I had not thought that abortion cases were an exception to the coda that appellate judges are not the triers of fact. It is apparent that when abortion comes on stage it shadows the role of settled judicial rules.

A.

While the majority correctly states that "the district court did not clearly err in finding that Act 620 provides minimal benefits," it also "credit[s] Louisiana's [claims of a] more robust record on the benefits side of the ledger" than the record of the Texas law's benefits in *WWH*. Louisiana contends that the purpose of the admitting privileges requirement is to facilitate care for women who experience complications during an abortion procedure that require admission to a hospital and to ensure the competence of physicians performing abortion procedures. The district court found that the law conferred no benefit and was "an inapt remedy for a problem that does not exist."[3]

The record provides ample evidence for the district court's findings that Act 620 "confers only minimal, at best, health benefits for women seeking abortions." Nationally, nearly one million abortions are performed each year, approximately 90% of which occur in the first trimester. There are two types of abortion procedures: surgical and medication abortion. Surgical abortion is minimally invasive and does not require an incision or the use of general anesthesia but instead uses only mild or moderate sedation and/or local anesthesia. Complications of surgical abortions are rare and can generally be managed in the clinic setting. Patients rarely suffer complications requiring

---

[3] The district court went on to emphasize that the state did not proffer any evidence that patients obtain better outcomes when their physicians have admitting privileges nor could the state point to an instance in which admitting privileges would have helped a woman obtain better treatment.

No. 17-30397

direct transfer from the clinic to the hospital. Medication abortion involves the combination of two drugs and requires no anesthesia or sedation.

The numbers are telling: the district court found that the prevalence of any complication in first trimester abortion in an outpatient setting is 0.8% and the prevalence of major complication requiring treatment in a hospital is 0.05%.[4] The risk of complication requiring hospitalization in the second trimester is 1.0%. The district court made findings that the incidence of complications requiring direct transport to a hospital is similarly low at Louisiana clinics. At the Hope Clinic, which serves approximately 3,000 patients a year, only four patients have required direct transfer to a hospital in the past 23 years. Between 2009 and mid-2014, the Bossier Clinic performed 4,171 abortions with only two patients requiring direct hospital transfer and the Causeway Clinic performed 10,836 abortions, with only one patient requiring direct hospital transfer. Among doctors involved in the litigation, the district court found that Doe 2 performed approximately 6,000 abortions between 2009 and mid-2014, with only two patients requiring direct hospital transfer, Doe 5 has performed thousands of abortions at Women's Health and Delta Clinic in the past three years and has never had a patient requiring hospital transfer, and Doe 6 has performed thousands of abortions in the past ten years with only two patients requiring a direct hospital transfer. Summarizing the evidence, the district court concluded that hospital transport was required "far less than once a year, or less than one per several thousand patients."

---

[4] The district court notes that the complication rate for a D&C procedure performed after a spontaneous miscarriage (a procedure which a doctor can legally perform under Louisiana law without admitting privileges) is higher than the complication rate for first trimester surgical abortion.

No. 17-30397

Those findings mirror findings credited by the Supreme Court in *WWH* that "before the act's passage, abortion in Texas was extremely safe with particularly low rates of serious complications and virtually no deaths occurring on account of the procedure."[5]

The district court documents the protocol followed by physicians and clinics in the rare instances where direct transfer to a hospital is required. As the majority notes, the statutory scheme that was in place prior to Act 620's passage required abortion clinics to have "a written transfer agreement with a physician who has admitting privileges within the same town or city."[6] There was testimony describing the process at the clinics for managing complications. For example, at Hope Clinic, if a physician determines that a patient needs direct transport to the hospital (a situation the district court found has presented for four patients in the past 23 years), emergency transport is called, the Clinic ensures that the chart is complete and sent to the hospital, and the physician contacts the hospital to alert the attending physician that the patient will be arriving and provides information about the complication.[7]

---

[5] *WWH*, 136, S. Ct. at 2311; *see also WWH*, 136 S. Ct. at 2320 (Ginsburg, J., concurring) (summarizing amicus brief for American College of Obstetricians and Gynecologists concluding that "[a]bortion is one of the safest medical procedures performed in the United States").

[6] Former LA. ADMIN. CODE tit. 48, pt. I, § 4407(A)(3).

[7] As the district court notes, most complications that arise from surgical abortion occur after the patient has left the clinic. In those cases, if the patient experiencing a complication contacts the clinic, the standard of care is for the clinic to advise her to go to the nearest hospital, which may be a hospital more than 30 miles from the clinic. A clinic physician's compliant admitting privileges would have no benefit to the patient experiencing a complication in that scenario (the most common class of patients experiencing complications from abortion procedures). *See also WWH*, 136 S. Ct. at 2311 (reciting district court's findings that "in respect to surgical abortion patients who do suffer complications requiring hospitalization, most of these complications occur in the days after the abortion, not on the spot . . . [and] if a patient needs a hospital in the day or week following her abortion, she will likely seek medical attention at the hospital nearest her home").

49

No. 17-30397

The majority notes that Louisiana, in an attempt to emphasize the importance of continuity of care, highlights three instances where Doe 3, the one physician who had admitting privileges prior to the passage of Act 620, used those privileges to care for patients who experienced complications following abortion procedures. As the majority acknowledges, however, there is no evidence in the record that those patients would not have received proper treatment had Doe 3 lacked admitting privileges. It is significant that the record is devoid of *any* instance of a patient receiving substandard care or suffering any medical hardship after experiencing a complication requiring hospital transfer at the hands of a physician without admitting privileges. The majority concedes this lack of evidence, and aptly refuses to credit a purported health benefit.

The majority does credit Act 620 with assisting in the credentialing of physicians. First, the majority contends that, unlike the Texas law at issue in *WWH*, Act 620 serves a credentialing function, filling a purported void created by the clinics' failure to perform a review of a provider's competency or to conduct criminal background checks. The district court made no such finding. Instead, the majority appears to rely on Doe 3's testimony that, as medical director at Hope, he was responsible for hiring new physicians for the clinic and, in that capacity, did not perform criminal background checks on two physicians he hired. In his testimony, Doe 3 describes the differences between the hiring process at Hope Clinic and at hospitals where Doe 3 has previously been involved in hiring, including Bossier Medical Center, Willis-Knighton Bossier, and Doctor's Hospital. Doe 3 testified that he sat on committees of those hospitals that approve admitting privileges requests and he answered affirmatively when asked if those committees consider the applying doctors' training, education, experience, and criminal backgrounds. In contrast, Doe 3

compared hiring at Hope Clinic to "setting up a private practice." He testified that there was no "committee" responsible for hiring because "there aren't that many physicians at Hope." Doe 3 did not run background checks and was the only person to consider their qualifications because, as medical director, he had sole responsibility for hiring. There is no dispute that hiring at clinics functions differently than hiring or consideration of admitting privileges at hospitals. The majority ascribes a benefit to that difference, a finding not made by the district court and not evident in the record. Doe 3 acknowledges that he trained the two physicians he hired to perform abortion procedures because they had previously practiced as an ophthalmologist and radiologist. The record is devoid of any finding that a single physician with a criminal history has been hired by Hope (or any of the other clinics providing abortion services in Louisiana), that any physician that has performed abortions was incompetent to provide such services, or that any patient has suffered for want of physician competence. On this record the "credentialing function" benefit is "a solution in search of a problem," one for which the majority is the main proponent.[8]

## B.

Having determined the absence of evidence that Act 620 will provide any benefit, we ask whether the burden imposed by the statute is "undue."[9] It is

---

[8] *Planned Parenthood of Wis., Inc. v. Van Hollen*, 94 F. Supp. 3d 949, 953 (W.D. Wis. 2015), aff'd *sub nom. Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908 (7th Cir. 2015) ("On the robust trial record, the court is, if anything, more convinced that the admitting privileges requirement in Act 37 remains a solution in search of a problem." (internal quotation marks omitted)).

[9] *Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 913 (9th Cir. 2014) ("[W]e must weigh the burdens against the state's justification, asking whether and to what extent the challenged regulation actually advances the state's interests. If a burden significantly exceeds what is necessary to advance the state's interests, it is 'undue.'"); *See also Schimel*, 806 F.3d at 920 ("The feebler the medical grounds (in this case, they are nonexistent), the

beyond strange that it is necessary to remind that "[i]t is not our task to re-try the facts of the case; this is especially true where the lower court's findings are based on oral testimony and the trial judge has viewed the demeanor and judged the credibility of the witnesses."[10] We cannot "reverse the findings of the trial judge simply because we are convinced that we would or could decide the case differently."[11] Yet, on the burdens side of the ledger, it is apparent that the majority here swiftly retries the case failing to credit findings that were not "clearly erroneous."

Louisiana disputes the district court's findings that two of the doctors would stop performing abortions if Act 620 went into effect. First, that the limited privileges Doe 2 obtained from Tulane qualify under Act 620 and the district court erred in concluding otherwise. Next, that the district court erred in finding that Doe 3 will no longer provide abortions in Louisiana if Act 620 takes effect because of a "well-founded concern for his personal safety" if he is the last remaining provider in either Louisiana or northern Louisiana, rejecting the district court's conclusion that Doe 3's "personal choice to stop practicing" can be legally attributed to Act 620.

Louisiana does not appear to dispute that: (1) Does 1 and 6 were unable to obtain privileges despite their good-faith efforts to do so; (2) Doe 2 was unable to obtain privileges *other* than the limited privileges obtained from

---

likelier is the burden on the right to abortion to be disproportionate to the benefits and therefore excessive.").

[10] *Franks v. Nat'l Dairy Prods. Corp.*, 414 F.2d 682, 685 (5th Cir. 1969) (internal citation omitted).

[11] *Guzman v. Hacienda Records and Recording Studio, Inc.*, 808 F.3d 1031 (5th Cir. 2015) ("Indeed, the great deference owed to the trial judge's finding compels the conclusion that '[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'" (citing *In re Luhr Bros., Inc.*, 157 F.3d 333, 338 (5th Cir. 1998))).

No. 17-30397

Tulane (which appellant argues qualify under Act 620); and (3) that Doe 5 was unable to obtain privileges at a hospital within 30 miles of Delta Clinic. The state did not challenge the district court's findings that Does 2, 5, and 6 each put in a good-faith effort to obtain admitting privileges—a plain waiver. Undeterred, the majority simply finds the opposite.

### 1. Doe 1

Doe 1 provides medication abortions through 8 weeks and surgical abortions through 13 weeks, six days at Hope Clinic in Shreveport, where he provides approximately 71% of the 3,000 abortions performed each year. The district court found that Doe 1 had put forth a good-faith effort to secure admitting privileges, documenting his attempts to secure privileges at five different hospitals and his inability to do so for reasons unrelated to his competence.

Doe 1 contacted the Family Medicine Department at University Health in Shreveport (where he had done his residency in family medicine) but was told by the department director that he would not be offered a position due to staff objections to his work at Hope Clinic. In another attempt to obtain privileges, Doe 1 applied to Minden Medical Center, but the staff coordinator rejected the application, stating "[s]ince we do not have a need for a satellite primary care physician at this time, I am returning your application and check." Hope's administrator contacted a third hospital, North Caddo, on Doe 1's behalf and was told they did not have the capacity to accommodate transfers. Doe 1 applied to WKBC as an addiction medicine specialist because he has a board certification in addiction medicine and the hospital has an addiction recovery center. His application was denied because he had not undergone a residency program in addiction medicine (a program which did not exist at the time he received his board certification). He reapplied as a

family practice specialist, at which time WKBC requested documentation of hospital admissions from the last 12 months. Because abortion procedures rarely result in complications requiring hospitalization, he had not admitted any patients in that timeframe so instead provided information about his training and procedures. The application remained pending neither approved nor denied by the hospital and the district court found that, under those circumstances, the application was de facto denied. The district court concluded that a fifth application, to Christus, was also de facto denied. Doe 1 submitted his application to Christus in July 2014 and subsequently provided additional information to Christus on two occasions when it was requested. When the administrator for the Hope Clinic called to make an appointment for Doe 1 to get an ID badge (also a requirement of the application process), the administrator was told Doe 1 had submitted the wrong type of application and needed to submit a "non-staff care giver" application (a type of privilege that would not qualify under Act 620). Doe 1 then received a letter stating that his application was incomplete for failing to obtain an ID badge, and would be deemed withdrawn. Doe 1 reached out to the hospital, and was again told that he would need to apply for non-staff care giver privileges, which would not qualify under Act 620.

The majority credits the district court's finding that Doe 1 has been unable to secure admitting privileges despite good-faith efforts to do so and agrees that Doe 1 will be required to stop providing abortions if Act 620 goes into effect.[12]

---

[12] While the majority concedes that the district court did not clearly err in concluding that Doe 1 put forth a good-faith effort to secure privileges, it still insists that "[t]here appears to be an unresolved communication problem with Christus, so it is possible Doe 1 could obtain qualifying privileges there." That reading is illustrative of the divergence between the district court's fact-finding and the majority's rehashing of those facts: what the majority calls an

No. 17-30397

2. Doe 2

Doe 2 provides medication abortions through 8 weeks and surgical abortions up to the legal limit of 21 weeks, 6 days. In the year prior to trial, Doe 2 performed 550 abortions at Bossier Clinic and 450 abortions at Causeway Clinic, or a total of 1,000 abortions. Since Bossier's closure, Doe 2 has entered into a working agreement with Hope to provide abortion services when Hope's primary physicians are unavailable to perform abortions.

The district court found that Doe 2 has been unsuccessful in his good-faith efforts to obtain active admitting privileges within 30 miles of the Bossier Clinic and that the limited privileges he obtained at Tulane were insufficient under Act 620 because those privileges did not allow him to "provide diagnostic and surgical services to [admitted patients]" consistent with the requirements of Act 620.

The district court documents Doe 2's attempts to secure admitting privileges at three separate hospitals. Doe 2 previously had admitting privileges at University Health while he was on staff as an Assistant Clinical Professor of Medicine with a general OB/GYN practice. After leaving the staff in 2004, Doe 2 maintained consulting privileges that did not allow him to admit patients. After the passage of Act 620, Doe 2 attempted to upgrade his privileges but was told by the head of the OB/GYN department that the hospital would not upgrade his privileges because of his abortion practice.[13]

---

"unresolved communication problem," the district court describes as reading like "a chapter in Franz Kafka's *The Trial*."

[13] Doe 2 testified that the head of the OB/GYN department took the request to the dean of University Health, who declined to offer Doe 2 admitting privileges. Doe 2 explained that he was not surprised by the result of the attempt "because of the political nature of what [he does] and the controversy of what [he does]."

No. 17-30397

Doe 2 also applied for privileges at WKBC in the summer of 2014. The OB/GYN department wrote to Doe 2 asking for more information including "operative notes and outcomes of cases performed within the last 12 months for the specific procedures you are requesting on the privilege request form." In his testimony before the district court, Doe 2 stated that it was impossible to submit information about procedures performed in hospitals because he had not "done any in-hospital work in ten years, so there is no body of hospitalized patients that [he had] to draw from."[14] Instead, Doe 2 testified that he submitted cases that he had done at the clinic in Bossier. At that point, WKBC sent a second letter, stating in relevant part: "The data submitted supports the procedures you perform, but does not support your request for hospital privileges. In order for the Panel to evaluate and make recommendations for hospital privileges they must evaluate patient admissions and management, consultations, and procedures performed. Without this information your application remains incomplete and cannot be processed."

Doe 2 also applied for admitting privileges at Tulane, a qualifying hospital under Act 620 within 30 miles of Causeway in Metairie. After a circuitous process, during which Doe 2 was told by a doctor at Tulane that his request would need to be discussed with the hospital's lobbyists and that there were faculty who were concerned that having an abortion provider on staff would hurt their referrals,[15] Doe 2 was granted limited privileges which would allow him to admit patients but not provide care for the patients.

---

[14] Because Doe 2 made a decision to "slow down" and stop his OB/GYN practice, he worked only at Causeway and Bossier, and "was not doing the type of practice that would lend itself to having hospitalized patients."

[15] Doe 2 was told that "[t]here were a few faculty who were not comfortable with covering; they were also concerned that 'Tulane as back up for an abortion clinic might not help our referrals.'"

No. 17-30397

Louisiana contends that the limited privileges Doe 2 was granted by Tulane are sufficient under Act 620. The majority rejects that argument, agreeing with the district court that the Tulane privileges do not satisfy the unambiguous requirements of Act 620. Louisiana does not argue on appeal that Doe 2 failed to put forth a good-faith effort to secure privileges elsewhere, instead relying on its interpretation of the Tulane privileges to argue that his limited privileges are sufficient under Act 620. Despite the fact that the state never makes the argument, the majority concludes that Doe 2's efforts with respect to securing privileges elsewhere were insufficient and that the district court's conclusion that Doe 2 had put forth a good-faith effort was clearly erroneous.

The majority notes without comment that Doe 2 claims University Health refused to extend him an invitation to apply because of his abortion practice.[16] With respect to WKBC, the majority states that "it remains unclear whether Doe 2 sent a list of cases." The majority continues, stating that the record does not establish whether WKBC found fault with the completeness of Doe 2's response to its inquiry or the actual documentation provided about cases at the Bossier Clinic. The majority's suggestion that Doe 2 was merely unresponsive to WKBC is belied by WKBC's own November letter to Doe 2—cited by the district court—stating that "*the data submitted* supports the procedures you perform, but does not support your request for hospital privileges." More importantly, Doe 2 testimony—supported by WKBC's letter[17]—highlights the principal conundrum with his attempts to get

---

[16] Whether the majority credits that finding by the district court is unclear.

[17] The letter WKBC sent to Doe 2 stated that, to consider Doe 2's application, the panel needed to "evaluate patient *admissions and management*, consultations and procedures performed. Without this information your application remains incomplete and cannot be

admitting privileges: Doe 2 cannot provide documentation of in-patient procedures performed (information required by WKBC) because the nature of providing abortion services makes hospital admissions rare on account of the rarity of complications associated with the those services.[18] To the extent the majority deems clearly erroneous the district court's finding that Doe 2 put forth a good-faith effort with respect to WKBC, it defies logic to suggest that Doe 2 could be awarded privileges if he had just "tried harder;" the hospital required information that did not exist. Furthermore, it is unclear how Doe 2's experience applying to WKBC differs from Doe 1's application to that hospital which the district court found to be de facto denied, a finding the majority appears to credit in one case, and reject in the other.

The majority next suggests that, "opposite to what the district court found," it is possible that Doe 2 could obtain privileges at Christus or Minden. While the district court did not make specific findings as to Christus or Minden, the record indicates that Doe 2 did not apply to either hospital. With respect to Minden, Doe 2 testified that applying for admissions privileges was a "long, tedious and not inexpensive process and [he] wanted to . . . apply to hospitals that [he] knew had good care and that had a close geographic location to the clinic and where [he] knew people might feel more comfortable." He stated that he chose WKBC, for example, because it was a good hospital, close

processed." (emphasis added). In short, WKBC requires documentation of hospital admissions to grant admitting privileges, documentation Doe 2 does not have because he has not admitted any patients.

[18] In response to defendant's question about whether his application had been formally denied, Doe 2 testified: "they haven't formally denied me. They just—when they receive information on hospitalized patients in the last 12 months, they will continue [] considering my application, even though I've explained that that information doesn't exist. I'm in a Catch 22 basically. I can't provide information I don't have."

to the clinic, whereas Minden is a smaller hospital, very close to the 30-mile limit, and he did not know anyone there.[19] There is nothing in the record that indicates Doe 2 would have received privileges at Minden or that the district court's finding that Doe 2 was putting forth a good-faith effort—despite not applying to Minden—was clearly erroneous.[20]

With respect to Christus, the majority concludes that it is possible that Doe 2 could obtain privileges there because he previously had privileges there and Doe 3 currently maintains privileges there, "contradicting" Doe 2's theory that a Catholic hospital would not staff an abortion provider. The majority ignores the fact that Doe 3's privileges at Christus are contingent on his admitting at least 50 patients a year, a requirement he is able to meet only because of his OB/GYN practice. confirmed in his testimony that he previously had admitting privileges at Christus because of his OB/GYN practice and that those privileges were terminated after he ceased to have a private practice affiliation. There is no support in the record for the conclusion that Christus would potentially award Doe 2 privileges, especially where, like Minden, Doe 1's application to the hospital was de facto denied. Putting aside hostility abortion providers face in the state, basic economics make clear why hospitals have no incentive to grant and every disincentive to deny privileges to an abortion provider who does not maintain a separate OB/GYN practice: by virtue of the safety of the procedures performed at the clinics, abortion

---

[19] Doe 2 specifically recalled trying to apply to hospitals "that [he] thought meant something" where he thought he would have the highest likelihood of success.

[20] This is especially true where Doe 1's application to Minden was denied because the hospital did not "have a need for a satellite primary care physician at this time." The majority does not identify anything in the record that would support its contention that Minden remains an open option for Doe 2 or point to anything that would differentiate the applications of Doe 2 from Doe 1.

providers admit very few—if any—patients to a hospital and risks loss of business by doing so. That principle is consistent with the experience at Christus described by Does 2 and 3, that privileges at Christus are contingent on a physician's ability admit a certain number of patients, which Does 2 and 3 are (and were) only able to do by virtue of their general OB/GYN practice.

### 3. Doe 3

Doe 3 provides medication abortions through eight weeks and surgical abortions through 16 weeks, six days. He performs approximately 20-30 abortions a week at Hope Clinic on Thursday afternoons and all day on Saturday and also maintains an active general OB/GYN practice. Doe 3 had privileges at Christus[21] and WKBC before the passage of Act 620 because of his private OB/GYN practice.[22] When asked if Doe 3 was able to increase his capacity of services provided at Hope, he stated that he could not.[23] As Doe 3 points out, if he gave up his private practice to devote more time to Hope to compensate for the providers who would no longer be able to practice, ironically, he would "probably lose [his] admitting privileges" and would no longer be able to provide abortion services.

The district court found that "[a]s a result of his fears of violence and harassment, Doe 3 had credibly testified that if he is the last physician performing abortion in either the entire state or in the northern part of the

---

[21] As noted previously, Doe 3's privileges at Christus require him to admit at least 50 patients a year, which he is able to do by virtue of his OB/GYN practice.

[22] When asked whether his privileges were a result of his private practice, Doe 3 testified: "That's right. I do not have admitting privileges because of my work at Hope."

[23] Doe 3 testified that his OB/GYN practice takes up approximately 70–80 hours each week, and that he spends an additional 10–15 hours working at Hope and that he physically could not handle working any more hours.

No. 17-30397

state, he will not continue to perform abortions."[24] The majority concludes that that finding was clearly erroneous because of Doe 3's "shifting story," at one point claiming he would stop practicing if he was the only provider left in Louisiana then, after Doe 5 obtained privileges in southern Louisiana, if he was the only provider left in northern Louisiana. In the majority's view, "Doe 3's shifting preference as to the number of remaining abortion providers is entirely independent of the admitting-privileges requirement," again a trial *de novo* finding by an appellate court.

### 4. Doe 4

Doe 4 performed abortions at Causeway Clinic in Metairie until January 2016, where he provided approximately 75% of the total abortions at the clinic. Prior to Causeway's closure, Doe 4 applied for privileges at Ochsner, where he did not receive a response, and testified at his deposition that he did not apply for admitting privileges at Touro Infirmary or LSU New Orleans because he had been unable to find an OB/GYN to cover for him, a requirement of both hospitals. Causeway closed in January 2016.[25] Because of Causeway's closure, Doe 4 is no longer pursuing privileges.

---

[24] In Doe 3's declaration, he states that if Act 620 takes effect and he is the only lawful abortion provider in the state of Louisiana, he has made the decision that he would no longer provide abortions because of the risk to his life, family, patients, co-workers, and reputation. At trial, when asked whether he would continue to practice if he was the only remaining physician providing abortions in Northern Louisiana, Doe 3 testified that he did not believe he would continue. The majority attributes the shift from "Louisiana" to "northern Louisiana" to gamesmanship, suggesting that Doe 3 changed his story after learning that Doe 5 obtained privileges in the southern part of the state.

[25] The district court did not receive evidence on Causeway's closure and therefore "dr[ew] no inferences regarding the cause of the closure."

No. 17-30397

### 5. Doe 5

Doe 5 provides medication abortions through eight weeks and surgical abortions through 16 weeks. He is one of two physicians providing abortion services at Women's Health in New Orleans, where he provides approximately 40% of the abortions, and the only physician at Delta Clinic in Baton Rouge. Since the passage of Act 620, Doe 5 has obtained active admitting privileges within 30 miles of Women's Health, at Touro Infirmary, but not within 30 miles of Delta Clinic.

The district court found that Doe 5 had put forth a good-faith effort to obtain admitting privileges at a hospital within 30 miles of Delta Clinic but was unable to do so for reasons unrelated to his competence. Doe 5 applied for admitting privileges at three hospitals in Baton Rouge: Woman's Hospital, Lane Regional Medical Center, and Baton Rouge General Medical Center. None of the applications submitted by Doe 5 have been denied or granted and all remain technically "pending", leading the district court to conclude they had been de facto denied. In his declaration, Doe 5 states that, after Act 620 was enacted, he reviewed bylaws and spoke to people in the medical communities in New Orleans and Baton Rouge to determine which hospitals would potentially grant him privileges. For example, Doe 5 describes some hospitals that require a physician to admit a certain number of patients per year to obtain privileges which he is unable to do.[26] Doe 5 chose, therefore, to apply to hospitals where "[he] believed that [he] had a realistic chance of obtaining admitting privileges" and did not apply to hospitals where he did not have a

---

[26] "Since I have not admitted patients for over two years, and the risk of a complication from an abortion requiring hospitalization is so low, I will not be able to meet these requirements."

62

good shot, in part because of the adverse professional consequences of having an application for admitting privileges denied.[27] Doe 5 states that Woman's Hospital has expressed concern that Doe 5 resides too far from the hospital to obtain privileges and mentions that a doctor he spoke with at Woman's Hospital—one of the doctors with whom Delta Clinic has a transfer agreement—declined to be Doe 5's covering physician for his Woman's Hospital application due to fear of threats and the possibility that protesters will picket outside of his private practice.

The district court found that Doe 5 put forth a good-faith effort to obtain admitting privileges within 30 miles of Delta Clinic. The majority concludes that finding was clearly erroneous. It faults Doe 5 for failing to present evidence that he reached out to additional doctors after the physician at Woman's Hospital refused to act as a covering physician and attributes his lack of follow-up with those hospitals to foot-dragging. The majority concludes from this that "[t]he most logical explanation for Doe 5's delay is that he is awaiting the result of this litigation before he acts."[28] The majority also imports testimony from Doe 4 (who was also unable obtain privileges before Causeway's closure) which the majority paraphrases as Doe 4 stating "that finding a covering physician is not overly burdensome."[29] Based on the absence

---

[27] Doe 5 describes that doctors must report denied applications to the National Practitioner Data Bank and are often required to report the denial on future applications for privileges at a hospital.

[28] It is unclear why the majority's explanation is any more persuasive than the district court's conclusion that the three hospitals to whom Doe 5 has applied have de facto denied his applications. Nothing in the record makes the district court's conclusion clearly erroneous. The majority simply prefers a different answer.

[29] The majority mischaracterizes Doe 4's testimony. When asked if *having* a covering physician was an overly burdensome requirement for admitting privileges, Doe 4 replied "[n]o, I don't think that's overburdening." Doe 4 was not asked whether *finding* a covering physician was overly burdensome. The distinction is more than semantics. While it is logical

in the record of evidence documenting follow-up by Doe 5 to the three hospitals to which he applied and the testimony of another doctor on the topic of covering physicians in the abstract, the majority concludes that the district court clearly erred in finding that Doe 5 put forth a good-faith effort to obtain privileges at a qualifying hospital near Delta Clinic.

### 6. Doe 6

Doe 6 provides medication abortions and is one of the two clinic physicians at Women's Health. Doe 6 had admitting privileges at various hospitals in New Orleans from 1973 until 2005, during which time he maintained an active OB/GYN practice. When Act 620 passed, Doe 6 contacted Tulane to inquire about admitting privileges but was told he would not be granted privileges because he had not had admitting privileges at any hospital since 2005. Doe 6 also applied for privileges at East Jefferson Hospital in New Orleans and, shortly thereafter, provided additional information that the hospital had requested. Since that time, the hospital has taken no action on his application. The district court concluded that his application had been de facto denied. In his declaration, Doe 6 states that, after the passage of Act 620, he researched hospitals and learned that many required that a physician admit a certain number of patients per year to obtain admitting privileges, which he could not do because the nature of his abortion practice. He applied at a hospital where he believed he had a realistic chance of obtaining privileges and

---

to agree—in the abstract—that having a covering physician is not an overly-restrictive requirement, when faced with identifying and securing such a physician, the reality on the ground appears to be very different.

knew that he was unlikely to obtain privileges at other hospitals that required a certain number of admitted patients.[30]

The majority concludes that the district court's finding that Doe 6 put forth a good-faith effort to obtain privileges was clearly erroneous. It faults Doe 6 for not submitting more applications for admitting privileges, especially where there are 9 qualifying hospitals in the area including Touro, where Doe 5 was able to secure admitting privileges. The majority determines that Doe 6's "lack of effort" makes the district court's finding clearly erroneous. The majority does not address Doe 6's statement in his declaration that he chose to apply to hospitals where he thought he had a "realistic chance" of obtaining privileges or his claim that he reviewed hospital bylaws and spoke with others in the medical community to determine where he could obtain admitting privileges without documentation of admitting patients since 2005.

### 7. Summary of the Burdens

After documenting the status of each of the six doctors who provided abortion services at the outset of the litigation, the district court made summary findings about the effects of Act 620. The court determined that Does 1, 2, 4, and 6 would be unable to provide abortions in Louisiana because of their inability to obtain admitting privileges, despite their good-faith efforts to do so. As to Doe 5, the court determined that he would be unable to provide abortion services at Delta in Baton Rouge because he was unable to obtain qualifying

---

[30] Based on his experience as an OB/GYN with admitting privileges for more than thirty years, Doe 6 was familiar with the admitting privileges requirements of at least three New Orleans hospitals, including Tulane University Hospital, Hotel Dieu Hospital, and Methodist Hospital. Doe 6 recalls deciding not to apply to renew his privileges when they expired in 2005 because he had shifted his practice to only gynecology and the low rate of complications associated with abortions at clinics prevented him from meeting the criteria of number of patients admitted to maintain his privileges.

privileges at a hospital in that area, but would be able to provide abortions at Women's Health in New Orleans because he had obtained privileges there. With respect to Doe 3, the court found that he would be the only remaining provider in Northern Louisiana and, due to a well-founded concern for his safety, would no longer provide abortions in the state.

In summary, the district court found that Doe 5 would be the only remaining abortion provider in the state and only one clinic, Women's Health, would remain open. Because Doe 5 performed approximately 2,950 abortions in 2013 at Delta and Women's, if he provided that number of abortions at Women's (the only clinic which would remain open on account of Doe 5 not obtaining privileges within 30 miles of Delta), approximately 70% of the 9,976 women in Louisiana seeking an abortion annually would be unable to get one.[31]

The district court made alternative findings, determining that, "[e]ven if one were to conclude that Doe 3 will not quit or that his quitting is legally irrelevant, Act 620 will nonetheless result in a substantial number of Louisiana women being unable to obtain an abortion in this state." If Doe 3's decision to quit due to fear of providing abortions as the last remaining physician in northern Louisiana was not attributed to Act 620's passage, two clinics would remain open: Hope and Women's Health. Doe 3 sees approximately 20–30 abortion patients per week, or roughly 1,000–1,500 per year, and has testified that, because of his full-time OB/GYN practice, cannot

[31] 9,976 abortions were performed in Louisiana in 2013. The 70% figure, as the district court notes, does not take into account the problems created for women in Louisiana who would need to travel a great distance to reach the clinic in New Orleans. In *WWH*, the Supreme Court recognized that increased travel times could contribute to a finding of undue burden. *WWH*, 136 S. Ct. at 2313 ("[I]ncreases in [driving distances] are but one additional burden, which, when taken together with others that the closings brought about, and when viewed in the light of the virtual absence of any health benefit, lead us to conclude that the record adequately supports the District Court's 'undue burden' conclusion.").

expand his capacity to provide abortions. Assuming Doe 3 and Doe 5 continue providing abortions, the district court found that approximately 5,500 women in Louisiana seeking an abortion would be unable to get one.

The district court notes that, although the closure of Causeway and Bossier has not been attributed to Act 620, the existence of two fewer abortion clinics (notwithstanding the court's finding that no doctor who was employed at those clinics was able to obtain admitting privileges) would amplify the burdens attributable to Act 620. Furthermore, the only physician who provides abortions up to the legal limit of 21 weeks, 6 days, Doe 2, will be unable to provide abortions, preventing any woman seeking an abortion at that stage from exercising her constitutional right to do so in Louisiana. The district court concluded that the burdens of Act 620 would fall most heavily on low-income women in the state, one of the poorest in the country, because of increased travel distances and associated cost. Finally, the court made the "common-sense inference" that increased wait times (on account of the decreased number of providers) would lead to women seeking abortions in later gestational ages, decreasing the number of women for whom medication abortion would be an option and making it difficult for women to obtain an appointment before 16 weeks.

The majority reaches different conclusions. On its determination of the facts, only Doe 1 has put forth a good-faith effort to get admitting privileges, Does 2, 5, and 6 "could likely obtain privileges," Doe 3 "is definitively not burdened,"[32] and all three clinics could remain open. Because there was clear

---

[32] Throughout the opinion, the majority refers to the burden imposed on the physicians and concludes that Act 620 is not overly burdensome on Does 3 and 5. *Casey* and its progeny do not ask us to consider whether a statute is burdensome on doctors providing abortions. Instead, we are required to consider whether there is an "undue burden on a woman's right to decide to have an abortion." *WWH*, 136 S. Ct. at 2300 (citing *Casey*, 505 U.S. at 878)

evidence in the record that doctors failed to seek admitting privileges in good faith, the majority says, any negative impact on women is attributable to an intervening cause: the inaction of the doctors rather than the statute. It proceeds to weigh the impact of what it determines to be the burden: the near impossibility of Doe 1 to obtain qualifying privileges. On that reading of the effects of Act 620, the majority concludes that the 2,100 abortions that Doe 1 had performed annually could be covered by Does 2 and 3 and, accordingly, no woman would be unduly burdened.[33] From there, the majority concludes that there will not be a large fraction of women facing a substantial burden: at most, 3,000[34] out of 10,000, or 30%, of women seeking abortions in Louisiana would be burdened by potentially longer wait times if Doe 1 was unable to practice,

_____

(internal quotation marks omitted). Again, the difference is more than semantics. If a statute leads to a number of abortion providers ceasing to provide services, that cessation of service will likely burden a woman's right to seek an abortion, regardless of whether the statute imposed a burden on the doctors. It is the burden on a woman's right to decide that must be weighed against the benefits of the statute, not the burden physicians face in trying to comply with new statutory requirements.

[33] To arrive at that conclusion, the majority concludes that Doe 2 could perform the same number of abortions at Hope that he had previously performed at Causeway and Bossier (approximately 1,000 annually). While there is evidence in the record that Doe 2 has entered into a working agreement to fill in at Hope when Does 1 and 3 are "absent due to scheduled time off, illness, the demands of their other practices, or for other reasons," there is no evidence in the record that Doe 2 will work at Hope full-time (not to mention the fact that he does not currently have admitting privileges and the district court's finding that he was unable to obtain privileges despite a good-faith effort to do so). As for the remaining 1,100 unaccounted for abortions previously performed by Doe 1, the majority determines that Does 2 and 3 would be able to absorb an additional 550 procedures per year. For this finding, the majority draws on "a wealth of information about Doe 3's capacity, down to the number of abortions he has performed in a single hour." The majority does not address Doe 3's testimony that he cannot increase his capacity because of his private OB/GYN practice, which he testified consumes approximately 70–80 hours a week. With its own "math," the majority calculates that Doe 3 will be able to perform the requisite additional 550 abortions a year by putting in an extra hour each day he works at the clinic, concluding that an extra hour cannot be a substantial burden.

[34] 3,000 represents the total number of women seeking abortions at Hope where Doe 1 practiced.

No. 17-30397

and that is only a potential burden because Doe 1's capacity will "easily be absorbed."

In sum, the district court found that 70% of women seeking an abortion in Louisiana would be unable to obtain one and the majority found that a maximum of 30% of women would be burdened with increased wait times, but that the burden of increased wait times was only potential. The district court's findings are well-supported in the record and not clearly erroneous.[35]

## II.

I turn now to the application of the *Casey* standard to those facts. Numbers and calculations aside, the task is straightforward: we are to identify the stated justification of Act 620, determine the extent to which Act 620 advances that interest, and compare the benefits it provides with the burdens it imposes on abortion access.[36] It is noted that Louisiana has a legitimate interest in ensuring the health and safety of patients seeking an abortion in the state.[37] However, even a statute which furthers a valid state interest cannot be a permissible means of serving legitimate ends if that statute "has the effect of placing a substantial obstacle in the path of a woman's choice."[38] At the same time, "[u]*nnecessary* health regulations that have the purpose or

---

[35] *Byram v. United States*, 705 F.2d 1418 (5th Cir. 1983) (reiterating that it is not the duty of an appellate court to retry the facts, even where the court is convinced that it would have "drawn different inferences than did the district court").

[36] *Casey*, 505 U.S. at 877–79.

[37] *WWH*, 136 S. Ct. at 2309 (citing *Roe v. Wade*, 410 U.S. 113, 150 (1973) ("The State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient.")).

[38] *Casey*, 505 U.S. at 877.

effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden" on the exercise of that right.[39]

At the outset, I fail to see how a statute with no medical benefit that is likely to restrict access to abortion can be considered anything but "undue." As I have explained, the majority draws conclusions for which there is no support in the record and rejects the district court's well-supported findings.[40] The findings of the district court that Does 1, 2, 5 (with respect to privileges near Delta), and 6 were unable to obtain privileges despite good-faith efforts to do so, for reasons unrelated to their competence, is plausible and well-supported. Moreover, it is logical. The district court received evidence that many hospitals require doctors to admit a certain number of patients annually to maintain privileges or require documentation of admitted patients in the 12 months preceding an application to award privileges. At the most basic level, even where a hospital does not have an explicit requirement conditioning privileges on minimum annual admissions, hospitals have no incentives to offer privileges to a doctor who provides only abortion services, because the doctor is unlikely to admit any patients or, in other words, to bring the hospital any

---

[39] *Casey*, 505 U.S. at 878 (emphasis added).

[40] Two striking examples bear repeating here. The majority concludes that Doe 2 did not put forth a good-faith effort because he did not apply to Christus and Minden which the majority determines remain open options. That flies in the face of evidence in the record that Christus requires applicants to be able to admit fifty patients annually (something Doe 2 cannot do) and evidence that Doe 1 applied and was unable to obtain privileges from either hospital (a finding the majority credits). Another doctor, Doe 5, applied to three hospitals but has been unable to find a doctor who will agree to cover him, a requirement for the application. The majority surmises—based only on the fact that there is no evidence that Doe 5 reached out to more than one doctor to serve as a covering physician—that the most logical explanation for Doe 5's delay is that he is awaiting the result of the litigation before acting. There is no evidence in the record of litigation gamesmanship and it is unclear to me why the majority's conclusion is "logical" or, more importantly, what makes the district court's finding clearly erroneous.

business and, being associated with abortion brings the concomitant risk of losing business.[41] Instead, the majority determines that the effort of the physicians was lackluster and that any burdens imposed would be a result of the physicians' mediocre efforts (or gamesmanship) rather than a direct result of the statute.

The Court in *WWH* addressed causation head-on, there rejecting the dissent's suggestion that, because some of the clinics may have closed for reasons unrelated to the statute, they should not "count" the burdens resulting from those closures against the statute.[42] The Court noted that the district court credited evidence of causation as well as "plausible inferences to be drawn from the timing of the clinic closures" and concluded from that evidence that the statute "in fact led to clinic closures."[43] As in *WWH*, the district court here found that the statute will cause three doctors to cease providing abortions in Louisiana altogether because of their inability to get admitting privileges despite their good-faith efforts to do so, another doctor to limit his

---

[41] As was the case in *WWH*, "doctors would be unable to maintain admitting privileges or obtain those privileges for the future, because the fact that abortions are so safe meant that providers were unlikely to have any patients to admit." *WWH*, 136 S. Ct. at 2312.

[42] *WWH*, 136 S. Ct. at 2313. The majority goes further than even the dissent in *WWH* would require. In his dissent in *WWH*, Justice Alito suggested that some of the clinics "may have ceased performing abortions (or reduced capacity) for one or more reasons having nothing to do with the provisions challenged here" such as in response to an unrelated law restricting family planning funding. *WWH*, 136 S. Ct. at 2345 (Alito, J., dissenting). The dissent continues, complaining that the petitioners did not present evidence "about the challenged provisions' role in causing the closure of each clinic." *Id.* The district court here credited precisely that evidence. Justice Alito in his dissent did not require what the majority demands here: the elimination of every potential intervening cause and the mitigation by physicians and clinics of the effects of the law.

[43] *Id.* ("The dissent's speculation that perhaps other evidence, not presented at trial or credited by the District Court, might have shown that some clinics closed for unrelated reasons does not provide sufficient ground to disturb the District Court's factual finding on that issue.").

work to one clinic for the same reason, and a final doctor to stop performing abortions out of fear of practicing as the sole remaining provider in northern Louisiana. The majority here distorts the causation analysis by casting aside the district court's findings that the physicians made "good-faith efforts" to obtain privileges, concluding that an intervening cause—the physicians' lackluster efforts to obtain privileges—will be responsible for any burden, not the statute itself. But the majority in *WWH* did not require proof that every abortion provider in Texas had put in a good-faith effort to get privileges and had been unable to so. Instead, the majority credited the district court's findings that the requirements imposed by the statute led to clinic closures.[44]

There is no question that, if the statute went into effect today, Doe 3 and Doe 5 will be the only remaining providers. The other providers do not currently have admitting privileges. The effect of the statute would be to close one of the three remaining clinics (Hope), to prevent three of the remaining five doctors from practicing as abortion providers (Does 1, 2, and 6), and to prevent Doe 5 from practicing at one of the two clinics where he regularly works. The majority today essentially holds that, because private actors (the physicians) have not tried hard enough to mitigate the effects of the act (a conclusion contradicted by the district court's factual findings), those effects are not fairly attributable to the act. That position finds no support in *WWH*.

Contrary to the majority's conclusion, the effect of the Act will be to place a substantial obstacle in the path of a woman's choice. Even setting aside the district court's finding that Doe 3 will stop practicing if he is the sole remaining provider in the northern part of the state, only two of the six doctors that previously provided abortions were able to obtain admitting privileges and one

---

[44] *WWH*, 136 S. Ct. at 2313.

of the three remaining clinics will close. Numerically, Doe 5 provides approximately 2,000 abortions at Delta and 950 abortions at Women's. Because he does not have privileges near Delta, Doe 5 will be restricted to providing abortions at Women's (and Delta will close). If he provides all 2,950 abortions he had previously provided at two clinics per year at Women's and Doe 3 continues to provide 1,500 abortions per year,[45] they could cover approximately 4,450 abortions per year, or less than half of the total demand in the state.

Because the effect of Act 620 is to place a substantial obstacle in the path of a woman's right to seek an abortion, without a discernable offsetting medical benefit, I would affirm the district court's determination that the burden is undue. Inherent in the concept of "undue" is the reality that where the medical grounds of a statute are weak (or nonexistent), the burden is more likely to be disproportionate.[46] The Supreme Court has previously admonished this court for "imply[ing] that a trial court should not consider the existence or nonexistence of medical benefits when considering whether a regulation of abortion constitutes an undue burden."[47] By failing to meaningfully balance

---

[45] According to the record, that is the high end of the number of abortions Doe 3 will be able to provide. Although the majority extrapolates from Doe 3's testimony that he has performed 6 abortions per hour to surmise that Doe 3 could cover an additional 550 abortions per year, that appellate finding is contradicted by Doe 3's testimony that he cannot increase his capacity because of his full-time OB/GYN practice.

[46] *Schimel*, 806 F.3d at 920 ("An abortion-restricting statute sought to be justified on medical grounds requires not only reason to believe (here lacking, as we have seen) that the medical grounds are valid, but also reason to believe that the restrictions are not disproportionate, in their effect on the right to an abortion, to the medical benefits that the restrictions are believed to confer and so do not impose an 'undue burden' on women seeking abortions. . . . The feebler the medical grounds (in this case, they are nonexistent), the likelier is the burden on the right to abortion to be disproportionate to the benefits and therefore excessive.").

[47] *WWH*, 136 S. Ct. at 2309.

the burdens and benefits here, the court repeats its mistakes and leaves the undue burden test devoid of meaning.

A brief pause now on the majority's heralding of the Supreme Court's "large fraction" language.[48] In *WWH*, the Court explained that, in *Casey*, the phrase "large fraction" was used "to refer to 'a large fraction of cases in which [the provision at issue] is *relevant*,' a class narrower than 'all women,' pregnant women,' or even 'the class of *women seeking abortions* identified by the state."[49] In other words, "[t]he proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant."[50] The "large fraction" language does not require the court to engage in rote mathematical calculations[51] but instead directs the court to focus its inquiry on those who will be actually restricted by the law and determine whether the law will operate as a substantial obstacle for that population.[52] In other words,

---

[48] *WWH*, 136 S. Ct. at 2320 (making clear that in the abortion context, a law is facially invalid if "in a large fraction of the cases in which it is relevant, it will operate as a substantial obstacle").

[49] *WWH*, 136 S. Ct. at 2320 (citing *Casey*, 505 U.S. at 894–95 (emphasis supplied by *WWH*)).

[50] *Casey*, 505 U.S. at 895. For example, in *Casey*, when analyzing the spousal-notification provision the Court narrowly construed the relevant class of women for whom a spousal-notification requirement was an actual restriction as "married women seeking abortions who do not wish to notify their husbands of their intentions and who do not qualify for one of the statutory exceptions to the notice requirement." *Casey*, 505 U.S. at 895–96. Even though all married women would have been required to comply, the Court defined the relevant class of women as only those who would truly be impacted by the law—i.e., those women who would be forced to change their behavior in light of the law. *Id.* The Court then determined that for a "large fraction" of that narrow class of women, the restriction would operate as a substantial obstacle. *Id.*

[51] *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 374 (6th Cir. 2006) (recognizing that the "large fraction" standard "is more conceptual than mathematical").

[52] The Court used the term "large fraction" in *Casey* to respond to the state's argument that the spousal-notification would affect only one percent of women seeking abortions. *Casey*, 505 U.S. at 894. Under the state's theory, because only 20% of the women who obtain abortions were married and 95% of those women notified their husbands voluntarily, the

will the law pose a substantial obstacle to a woman's choice for a large fraction of those affected.

The elaborate "mathematical" calculations attempted by the majority are improper. Indeed, the Supreme Court rejected this court's attempt to require precise mathematical calculations in *WWH*. In that case, after weighing the benefits and burdens, the district court determined that a "significant, but ultimately unknowable" number of women would be unduly burdened by the challenged provisions.[53] This court reversed, in part because the district court had not numerically calculated that a "large fraction" of women would be burdened.[54] The Supreme Court rejected that approach, emphasizing that the district court had developed a sufficient record to support its finding that weighing the benefits and burdens demonstrated that the restrictions represented an undue burden. Neither *Casey* nor *WWH* calculated a numerical fraction of women who would be burdened before invalidating statutory provisions. Such a calculation is not required.

The relevant question here is, for those women actually restricted by Act 620, will that restriction amount to a substantial obstacle for a significant number of women. For those actually restricted, there is no question that the

---

effects of the provision would only be felt by one percent of the women seeking abortions. *Id.* The Court rejected that argument, making clear that "[t]he analysis does not end with the one percent of women upon whom the statute operates; it begins there. . . . The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant. . . . [I]n a large fraction of the cases in which [the provision] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Id.* at 894–95. In other words, the Court's discussion of "large fraction" was intended to direct courts to focus their constitutional inquiry on the relevant population, not to require courts to engage in elaborate calculations of numerators and denominators.

[53] *Whole Woman's Health v. Lakey*, 46 F. Supp. 3d 673, 686 (W.D. Tex. 2014).

[54] *Whole Woman's Health v. Cole*, 790 F.3d 563, 586–90 (5th Cir. 2015) (per curiam).

obstacle will be substantial. Over 5,000 women seeking abortions in Louisiana will be unable to obtain one within the state. Because Doe 2 has been unable to obtain privileges, no woman seeking to exercise her right to decide to seek an abortion after 16 weeks will be able to do so in Louisiana.

Even accepting the majority's incorrect supposition that only Doe 1 will stop performing abortions and accepting their premise that the Supreme Court requires a numerical calculation of the fraction of women for whom the provision represents a substantial obstacle (which it does not), the calculations are flawed.[55] If Act 620 causes only one doctor to stop performing abortions at Hope Clinic, then the women for whom the law is "an actual rather than irrelevant restriction" will be *women seeking abortions at Hope Clinic.* As was the case in Texas, those are the women who will be subjected to "fewer doctors, longer waiting times, and increased crowding."[56] The question then becomes whether Act 620 will "operate as a substantial obstacle" to a large fraction of *women seeking abortions at Hope Clinic.* The majority's assumptions that (1) Doe 2 will step in to be a full-time provider at Hope and (2) Doe 3 will have the capacity to increase his patient load are unsupported (and in the case of Doe 3,

---

[55] The majority relies in part on a Sixth Circuit case that determined 12% was an insufficient number to reach the large fraction requirement. *Cincinnati Women's Servs.*, 468 F.3d at 374. In that case, however, the Sixth Circuit properly limited the analysis to the women actually affected by the restriction. *Id.* at 370. The court was considering a judicial bypass statute and found that "the group of women for whom the restriction actually operates are women who are denied a bypass and who have changed circumstances such that if they were able to reapply for a bypass, it would be granted." *Id.* The majority here continues to define the relevant population of women as women seeking abortion in the state. But that precise definition was rejected by the Supreme Court in *WWH* when it analyzed a substantially similar statute. *WWH*, 136 S. Ct. at 2320 (describing the "'large fraction of cases in which [the provision at issue] is relevant'" as "a class narrower than . . . 'the class of women seeking abortions identified by the State'" (citing *Casey*, 505 U.S. at 894–95) (emphasis omitted)).

[56] *Whole Woman's Health*, 136 S. Ct. at 2313.

contradicted) by the record.[57] Even if Doe 1 were the only provider to stop performing abortions, it would create a substantial obstacle for women seeking abortions at Hope in the form of increased wait times and the inability for some women to get an appointment before they passed the appropriate gestational stage. In short, even accepting the majority's requirement of precise numerical calculations on its own terms—and I do not—the calculations are flawed.

### III.

I disagree with the majority's application of the undue burden test. Act 620 will have the effect of placing a substantial obstacle in the path of women seeking to exercise their constitutional right. Its significant burdens are not counteracted by any discernable health benefit and the majority errs in holding otherwise. But perhaps the more fundamental misstep here is that the majority fails to respect its role as an appellate court and the role of our district courts. These roles are structural, that is, case neutral.

There remains another fundamental flaw in Louisiana's joining with Texas and other states in regulating abortion services, one that also requires that the judgment of the district court be affirmed. Although it is enough under *Casey* to find an undue burden where Act 620 will have the *effect* of placing a substantial obstacle in the path of women seeking abortions in the state,[58] that is also the law's purpose. If courts continue to brush past the purpose prong of *Casey*, that prong will cease to have meaning. *Casey* directs us to examine the

---

[57] Hope's director testified that even the loss of only Doe 1 at Hope "would be devastating" for the clinic's operations.

[58] *WWH*, 136 S. Ct. at 2300 ("In [*Casey*], a plurality of the Court concluded that there 'exists' an 'undue burden' on a woman's right to decide to have an abortion, an consequently a provision of law is constitutionally invalid, if the '*purpose or effect*' of the provision 'is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." (emphasis altered)).

means chosen by the state to further its interest and warns that those means must be calculated to further that interest, not hinder it.[59] As in other areas of constitutional law, courts are capable of determining whether the means chosen by the state match the legitimate ends.[60] Indeed, it remains central to much of our constitutional doctrine. While motive of a legislative body cannot for pragmatic reasons index the legitimacy of its work, legislative purpose can. At that level of abstraction, there can be little disagreement.

Despite judicial struggle with *Casey*, it must be acknowledged that the Court redefined, but did not abandon those basic principles. It moved away from the analytical construct of tiered scrutiny to "undue burden" but left intact examination of purpose by deploy of the familiar doctrinal tool of ends and means, allowing courts to identify legislative efforts to frustrate a woman's autonomy—her right to choose. As the misfit of means and ends grows so also does the permissible inference that the state's invocation of legitimate ends is disingenuous, that the statute is instead "designed to strike at the right

---

[59] *Casey*, 505 U.S. at 877 ("A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus. A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it. And a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.").

[60] *See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ("[T]he [challenged provision] does not advance the State's asserted interest in physician confidentiality. The limited range of available privacy options instead reflects the State's *impermissible purpose to burden disfavored speech*." (emphasis added)); *Romer v. Evans*, 517 U.S. 620, 635 (1996) ("The breadth of the amendment is so far removed from these particular justifications that we find it impossible to credit them. We cannot say that [the amendment] is directed to any identifiable legitimate purpose or discrete objective. It is a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests.").

itself."[61] While everyone agrees that promoting women's health is a legitimate goal, Act 620 does not further that purpose. Here the means need not be judged normatively, but rather present as a practice the efficacy of which is determinable empirically: the data make plain that the requirement of admitting privileges to the end of women's health cannot be defended. For as the claimed benefits of Act 620 are objectively determinable to be virtually nil, so the burdens are determined to be undue. In the absence of fit between the means (requiring admitting privileges) and the ends (ensuring women's health), I am left to conclude that, viewed objectively, there is an invidious purpose at play. I recall these familiar principles to make plain that while the effects prong of "undue burden" does the work here, an examination of *Casey*'s legislative purpose reaches the same end. Act 620 was enacted to frustrate a woman's right to choose.

That the Supreme Court found it necessary so recently to remind this court that a rational basis test, appropriate in review of state economic regulation, cannot be deployed to review regulation of a protected personal liberty is only confirming that when abortion shows up, application of the rules of law grows opaque, a phenomenon not unique to this court.[62] Today's case is not a close call by either path offered by *Casey*. The opinion of my colleagues, with respect, ought not stand.

---

[61] *Casey*, 505 U.S. at 874.

[62] *WWH*, 136 S. Ct. at 2309–10 ("The Court of Appeals' articulation of the relevant standard is incorrect. . . . [T]he second part of the test is wrong to equate the judicial review applicable to the regulation of a constitutionally protected personal liberty with the less strict review applicable where, for example, economic legislation is at issue.").